**TATUM v. UNITED STATES.**
No. 10540.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 2, 1950.

Decided May 5, 1951.

Clark, Circuit Judge, dissented.

George E. C. Hayes, Washington, D. C. (appointed by the District Court), for appellant.

Richard M. Roberts, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty., Cecil R. Heflin, Joseph M. Howard, and Harold H. Bacon, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

Before CLARK, PRETTYMAN and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Appellant Ernest Tatum, a twenty-seven year old laborer, pleaded "not guilty" to an indictment charging him with the rape of complainant, a nine year old female child.[1] Because appellant was without means to employ counsel, the court appointed a member of the bar to conduct his defense. Upon trial, the jury returned a verdict of "guilty" to which they added the words "with the death penalty" in accordance with their authority under the statute.

The evidence presented by the prosecution revealed that appellant was invited to

---

[1]. The prosecution was brought under 22 D.C.Code § 2801 (1940) which provides: "Whoever has carnal knowledge of a female forcibly and against her will, or carnally knows and abuses a female child under sixteen years of age, shall be imprisoned for not more than thirty years: *Provided*, That in any case of rape the jury may add to their verdict, if it be guilty, the words 'with the death penalty,' in which case the punishment shall be death by electrocution: *Provided further*, That if the jury fail to agree as to the punishment the verdict of guilty shall be received and the punishment shall be imprisonment as provided in this section."

visit the apartment of friends. He arrived at the house at about 2 p. m. on the afternoon of July 29, 1949. On his way up to the apartment he intended to visit, he stopped in at the apartment on the floor below where the complainant and her mother, whom he had known for about three years, lived. After about five minutes, the mother asked him to leave because it seemed clear to her that he had been drinking. He complied and continued on to his friends. There is evidence that he was drinking whiskey and beer during the course of the afternoon. At about 6 p. m. of the same day, he went down to the yard in front of the building where the complainant child was playing, took her by the arm, and told her to come with him. She obeyed and he led her to a secluded place near the railroad tracks, some ten or twelve blocks away from her home. He kept her in that vicinity for several hours during which time he had intercourse with her once and slept intermittently. At approximately 1:45 the following morning, he took her to the basement dwelling occupied by a Miss Jessie Coppedge. While he was in the bathroom, Miss Coppedge noticed that the child was bleeding and at once telephoned the police. Before the officers arrived, appellant fled through the bathroom window. At about eight o'clock that same morning, appellant telephoned Miss Coppedge and requested that she lend him two dollars and bring it to him at a designated place. She agreed, then called the police who apprehended him. The child had previously been taken to the hospital where she remained for fourteen days because of the injuries attendant upon the act of intercourse.

Appellant took the stand and testified that the child's mother had joined him and his friends in the latters' apartment for a short time during the afternoon of drinking. This was denied by the mother. He further testified that she was very hostile toward him as a result of a past intimate relationship between them. It was his belief that, for that reason, she might have drugged him during the time she was present at the drinking bout. He pointed out that he felt as if he had been "doped" when he left his friends at the end of the afternoon.

In essence, however, the entire defense rested upon appellant's insistence that he remembered nothing of what happened at the time the offense was committed. Much of the record below is devoted to that contention. Nevertheless, counsel for the accused failed to request that the issue of sanity—i. e., legal responsibility for his acts—be submitted to the jury under the guidance of instructions. The court did not mention the subject in its charge. And no exception was taken to such omission. The only questions urged on this appeal as a basis for reversal are (1) improper exercise by the jury of its statutory authority to sentence defendant to death; (2) the trial court's refusal to grant a continuance requested by defense counsel in order to produce an additional witness or two.

 Ordinarily, failure of counsel to record his exceptions to the charge would constitute a waiver of the points not raised.[2] It has always been the custom of this court, however, "in cases of serious criminal offenses, to check carefully the record for error prejudicial to defendant which he did not urge."[3] This accords

---

2. Rule 30 of the Federal Rules of Criminal Procedure. 18 U.S.C.A., provides, in pertinent part, that

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

See Villaroman v. United States, D.C. Cir., 1950, 184 F.2d 261, 262–263.

3. Williams v. United States, 1942, 76 U.S. App.D.C. 299, 300, 131 F.2d 21, 22; McKenzie v. United States, 1942, 75 U.S. App.D.C. 270, 271, 126 F.2d 533, 534. Accord: Fisher v. United States, 1946, 328 U.S. 463, 467–468, 66 S.Ct. 1318, 90 L.Ed. 1382; Screws v. United States, 1945, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Atkinson, 1936, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555; Clyatt v. United States, 1905, 197 U.S. 207, 221–222, 25 S.Ct. 429, 49

with Rule 52(b) of the Federal Rules of Criminal Procedure, which provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The basic question in any such scrutiny of the record is whether the errors which may be discovered affect "substantial rights." Failure on the part of a trial court in a criminal case to "instruct on all essential questions of law involved in the case, whether requested or not"[4] would clearly "affect substantial rights" within the meaning of Rule 52(b). Since appellant's defense went to the question of his mental responsibility and there was no reference thereto in the court's charge to the jury, we must determine (1) whether that issue was an "essential" question, (2) whether it was sufficiently raised by the evidence to require its submission to the jury.

When lack of mental capacity is raised as a defense to a charge of crime, the law accepts the general experience of mankind and presumes that all people, including those accused of crime, are sane. But as soon as "some evidence of mental disorder is introduced, the prevailing rule in most jurisdictions is that sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt."[5] That is the rule followed by the Supreme Court and by this court.[6] The leading authority on the subject is Davis v. United States,[7] where the Supreme Court said: "Strictly speaking, the burden of proof * * * is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged." In view of these authorities, it seems clear to us that sanity is an "essential" issue which, if actually litigated—that is, if "some proof is adduced" tending to support the defense—must be submitted to the jury under the guidance of instructions.

We are aware, of course, that any attempt to formulate a quantitative measure of the amount of evidence necessary to raise an issue can produce no more than an illusory definiteness. But if some such measure is to be attempted, we think the best approach is that expressed by us in Kinard v. United States,[8] a prosecution for murder in which the trial judge had not submitted the issue of manslaughter to the jury. We said there that " 'The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-de-

L.Ed. 726; Morris v. United States, 9 Cir., 1946, 156 F.2d 525, 527, 169 A.L. R. 305; United States v. Levy, 3 Cir., 1946, 153 F.2d 995, 998.

4. Kreiner v. United States, 2 Cir., 1926, 11 F.2d 722, 731, quoted in Kinard v. United States, 1938, 68 App.D.C. 250, 252, 96 F.2d 522, 524; Screws v. United States, 1945, 325 U.S. 91, 106-107, 65 S. Ct. 1031, 89 L.Ed. 1495; George v. United States, 1942, 75 U.S.App.D.C. 197, 201, 125 F.2d 559, 563; Miller v. United States, 10 Cir., 1941, 120 F.2d 968, 972.

5. Glueck, Mental Disorder and the Criminal Law 41-42 (1925).

6. Davis v. United States, 1895, 160 U.S. 469, 486-488, 16 S.Ct. 353, 40 L.Ed. 499; Battle v. United States, 1908, 209 U.S. 36, 38, 28 S.Ct. 422, 52 L.Ed. 670; Holloway v. United States, 1945, 80 U.S. App.D.C. 3, 4, 148 F.2d 665, 666. See also Cunningham v. State, 1879, 56 Miss. 269, 274-276; People v. Spencer, 1904, 179 N.Y. 408, 72 N.E. 461, 462; Miller, Criminal Law 135-136 (1933).

7. Supra note 6, 160 U.S. at pages 487-488, 16 S.Ct. 353.

8. 1938, 68 App.D.C. 250, 253-254, 96 F.2d 522, 525-526, quoting from Stevenson v. United States, 1896, 162 U.S. 313, 315, 16 S.Ct. 839, 40 L.Ed. 980.

fense, and yet, so long as there was *some evidence relevant to the issue* of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.'" [Emphasis supplied.]

We think it would be incorrect to infer from the language in Holloway v. United States[9] that the "evidence sufficient to create a reasonable doubt" test is to govern for the purpose of determining when an instruction should be given. The reference in that case was addressed to the nature of the instruction rather than to the state of the evidence making it "essential" that it be given. A rule that an instruction should be given only when an accused presented evidence "sufficient to create a reasonable doubt" would tend to give the presumption of sanity greater effect than appears to have been intended in the Davis case, relied upon in Holloway. The result might be to remove the question of sanity from the jury despite the fact that "some proof is adduced" in support of the defense, and even though the jury is at liberty to reject the opinion evidence of prosecution experts—to believe and disbelieve witnesses, including the accused, as it wishes.[10]

■ In sum, the function of the trial court in regard to the issue of sanity is to determine whether that issue is brought into the case by evidence. If it is, then it should be submitted to the jury with instructions that if the jury has a reasonable doubt of the defendant's sanity, there must be an acquittal.

■ We are convinced by our examination of the record that the issue of appellant's sanity at the time the offense was committed was sufficiently raised by the testimony at trial to require its submission to the jury under the guidance of instructions. From the moment of his apprehension by the police and continuing throughout the trial below, appellant consistently maintained that he remembered nothing of what had transpired on the critical night. Dr. Murphy, a Deputy Coroner, testified that when appellant was brought before him for examination the day after the crime, "The man appeared to me to be in more or less of a trance."[11] Officer Grant, who arrested appellant on the morning after the crime, said "he didn't act normal, in my estimation."[12] There was also testimony from Officer Howe with regard to appellant's appearance as "abnormal."[13] And, on several occasions during the trial, the prosecutor asked Government witnesses whether appellant had appeared "normal," "insane," etc.[14] But the clearest indication that appellant's sanity was actually in issue is revealed in the colloquy between the court and prosecutor when the court inquired whether there had been a mental examination of the accused. The prosecutor replied that there had been and then, after some discussion, said:

Mr. Heflin. In view of the defense here, I think I am going to call Dr. Perretti, and Dr. Gilbert if he also examined him.

\* \* \* \* \* \* \*

Mr. Heflin. If he is taking the position that he is insane.

The Court. I think it might be useful to call them in rebuttal. That won't take long.[15]

\* \* \* \* \* \* \*

Mr. Heflin: Yes, I think I better do that. *There is a possibility the jury might think there is something wrong mentally.*[16] Thereafter, the two psychiatrists were called by the Government to rebut what was conceived, and what we also believe, to have been the defense. They testified that appellant was of "sound mind" both at the time the crime was committed and at

9. 80 U.S.App.D.C. 3, 148 F.2d 665 at page 666.

10. State v. Moore, 1938, 42 N.M. 135, 76 P.2d 19, 34; 1 Reid's Branson, Instructions to Juries § 35 (1936).

11. Tr. p. 109. See also Tr. p. 110.

12. Tr. p. 127.

13. Tr. pp. 141–144.

14. See, e. g., Tr. pp. 111, 128.

15. Tr. pp. 196–197.

16. Tr. p. 204 (emphasis supplied).

the time of examination.[17] Dr. Gilbert described his alleged lapse of memory as malingering but Dr. Perretti made no finding that that was the case.[18] It was suggested that symptoms such as those manifested by appellant might be found in a person suffering from alcoholic amnesia, but both experts testified that he had not been suffering from such a condition.[19] However, there was testimony that, after arrest, Tatum was kept for some time in the "special wing, where disturbed persons are placed in the jail,"[20] and several days in the psychiatric department of Gallinger Hospital.[21]

▇▇▇ We do not intend to characterize the case for the defense as either strong or weak. That is unnecessary, for "in criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. He is entitled to have such instructions even though the sole testimony in support of the defense is his own." [22] In the present case—one involving a possible death penalty—the jury was told nothing about the defense of insanity. For all they may have known, Tatum might have been legally insane and yet they would have been required to hold him legally responsible, so long as they believed he had committed the acts constituting the crime charged.[23] As we said in Williams v. United States, 1942, 76 U.S.App.D.C. 299, 301, 131 F.2d 21, 23, trial by a jury of peers "is supposed to safeguard our institution of fair trial by insuring impartiality. But of what value is an open mind, if it does not know, with clear delineation, the issues upon which it is to pass judgment?" The complete absence of instructions by the court on the essential issue of appellant's sanity requires that the case be reversed and remanded for a new trial.

We think there is another matter, not urged here but revealed by our examination of the record, which affected substantial rights of the accused. It stems from a statement made by defense counsel and was brought to our attention by the following reference in the trial judge's charge to the jury: Defense counsel, with commendable candor, who has indeed a difficult task in this case, as he has said, admits that a verdict of guilty is proper under the circumstances and the evidence in this case.[24] While that admission by counsel does not appear in any portion of the transcript of the trial below, certain of his remarks in support of a motion for new trial indicate that it was made in the closing argument to the jury.[25]

At the argument before this court, defense counsel was asked to explain why he had made such an admission. In substance, he stated that he was laboring under the handicap of representing one accused of a grave crime who gave no information or assistance because of a claimed lapse of memory; that while he thought the accused might be legally sane, he considered him to be "abnormal"; that the force of the Government's case indicated extreme danger that the jury might agree to impose the death penalty; that an attempt to get the jury to consider defendant's abnormality in mitigation of punishment and avert the extreme penalty would be more effective if it were coupled with the candor of a concession of guilt; that it was not an uncommon practice of the

17. Tr. pp. 209–210, 228–229.

18. Tr. pp. 210, 214, 229.

19. Tr. pp. 212–213, 231.

20. Tr. p. 211.

21. Tr. p. 232.

22. 53 Am.Jur., Trial, § 580, p. 458.

23. It should be noted that 24 D.C.Code § 301 requires that a jury acquitting on the sole ground of insanity must set forth that fact in their verdict so that commitment to a mental institution may follow. See State v. Crowe, 1909, 39 Mont. 174, 102 P. 579, 583, where the appellate court reversed the trial court because it had not told the jury they could bring in a verdict of "not guilty by reason of insanity."

24. Tr. p. 242.

25. Tr. on Defendant's Motion for New Trial, p. 2.

bar, under these circumstances, to assume this calculated risk in the hazards of a criminal trial; and that he acted in good faith and upon his best judgment.

The problem which confronted counsel when he faced the jury for summation was created by the fact that although the jury had two functions, one to determine guilt or innocence and the other to pass upon the death sentence, there is no established procedure in this jurisdiction by which he could effectively establish the difference in the standards of mental capacity applicable to the two functions. So far as the accustomed practice went, the only instruction on mental capacity he could hope to secure from the court was an instruction on legal sanity. That instruction was, as we have held, necessary upon the state of the evidence, but it was controlling only upon the question of guilt or innocence. The death sentence, under the doctrine of Winston v. United States,[26] was within "the sound discretion of the jury, and of the jury alone", and in considering the imposition of that sentence the jury might give weight to any consideration—"age, sex, ignorance, illness, or intoxication, * * * or any other consideration whatever". In view of this, the jury might be of opinion that it would not be just or wise to impose capital punishment. Lacking precedent for an instruction to the jury along that line, counsel selected the course we have described. Even so, we think he went too far. His client had not conceded guilt. On the contrary, as we have seen, an issue of mental capacity had been raised. When counsel conceded to the jury that a verdict of guilty was proper, he conceded away that defense. Thus, by action of court-appointed counsel, appellant was deprived of the judgment of the jury upon the defense he had advanced and also upon the credibility of the prosecution's case. We think that in the circumstances of this case the action of counsel was a defect "affecting substantial rights." [27] We are not, of course, implying any general restriction upon concessions by counsel, some of which are not only proper but highly commendable.

The learned trial judge's reference, in the course of his charge, to the concession of guilt indicated approval of the method selected by counsel in his attempt to resolve a difficult problem. Apparently relying upon defense counsel's view of the matter, the court did not specifically caution the jury that, notwithstanding the unauthorized concession, the defendant was entitled to have that body alone determine his guilt or innocence. Although perhaps unintended, the effect of this omission was, for all practical purposes, to leave the jury only with the question whether it could agree on adding the words "with the death penalty." This was a defect "affecting substantial rights."

We are not unmindful of the serious import of reversing a criminal conviction. This is particularly true here in view of the nature of the crime charged. But it is not because of "mere legal technicalities" that we order the remand of this case. We are concerned here with the preservation of safeguards which rest upon our faith in the worth and dignity of the individual. Their purpose is to insure equal justice under law. Thus, their vitality depends upon their being assured to all persons, even those accused of the most reprehensible crimes. And the injury resulting from their denial is not lessened even when it occurs under the aegis of an able and conscientious bench and bar. Their application is necessary here to prevent the possibility that punishment will be imposed upon one who may be without the power to reason and therefore may not be subject to blame.[28]

It should be noted that if appellant were ultimately acquitted on retrial because of insanity, he need not be set free but might be committed to a mental institution,[29]

26. 1899, 172 U.S. 303, 19 S.Ct. 212, 215, 43 L.Ed. 456.

27. See discussion and authorities collected in Diggs v. Welch, 1945, 80 U.S.App.D.C. 5, 7, 148 F.2d 667, 669.

28. Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 4–5, 148 F.2d 665, 666–667.

29. § 24–301 of the D. C. Code provides, " * * * if an accused person shall be

thereby satisfying the interest of society both in the safety of the public and in the rehabilitation of the offender.

In view of what we have said concerning the disposition of this appeal, we deem it unnecessary to consider the issues which were raised and discussed in the briefs filed here.

Reversed and remanded for a new trial.

CLARK, Circuit Judge (dissenting).

I dissent. In my opinion this is a truly shocking decision, the most shocking that has emanated from this Court and ranking among the most shocking judicial decisions. It is one step below the famous decree of the Supreme Court of Missouri, many years ago, when it reversed outright a first degree murder case on the ground that the grand jury had inadvertently left out the word "the" in the indictment.

It is not necessary to recount in all its horrid details this most revolting of crimes. Suffice it to say that the defendant raped a little nine-year-old child. He offered not a scintilla of evidence in his own defense except to say that he could not remember what had occurred.

Here at a time when the wave of sex crimes has reached such an alarming extent that Congress, the Bar, the prosecuting officials, the public and the press have been aroused as never before to the necessity of stamping it out, it remains for the highest court of this jurisdiction to flout the necessity for reform by reversing this case on a technicality so flimsy and unsound that it had to be evolved out of the inner consciousness of a member of the majority.

This appellant was apprehended by the police on the day following the commission of the crime. The testimony of the police officers was that he did not appear "normal". Few men do when they have a bad hangover.

When arraigned, appellant stated that he was without funds to employ counsel. The Court thereupon appointed Mr. George E. C. Hayes, one of the ablest and most respected members who practices at this Bar. Mr. Hayes, according to his own statement to this Court and the trial court, said that he had not been able to find any evidence as to the commission of the crime that negatived the certainty of appellant's guilt except the far fetched theory advanced by appellant himself that he might have been doped by the mother of the child who had formerly been his mistress. There was not a shred of evidence to support this theory. Mr. Hayes therefore adopted the strategy of admitting guilt but of trying to avert the death penalty. In my opinion this was sound strategy even though it did not prove successful in this case. Mr. Hayes accordingly stated frankly to the jury that he believed the defendant guilty. The trial court adopted this statement from defendant's counsel and incorporated it in his charge to the jury.

This is the gist of the majority's complaint. I freely admit that the trial court is perhaps to be censured for telling the jury that Tatum was guilty, even after the admission by his own counsel, but I insist that it was not reversible error because of the circumstances of the case and the theory on which it was being tried by defendant's counsel. If the repetition was error it was certainly harmless error.

The other point labored by the majority is that Judge Holtzoff erred, in failing to give, wholly on his own motion, an unasked for instruction that the Government had to prove Tatum's sanity *beyond a reasonable doubt*. Under the doctrine of Holloway v. U. S., 1945, 80 U.S.App.D.C. 3, 148 F.2d 665, 666, "the burden is on the accused to overcome the presumption of sanity by evidence sufficient to create a reasonable doubt as to his mental capacity to commit the offense." When the defendant has thus set up his defense, the prosecution must establish the sanity of the accused. It is only after this situation exists that the defendant becomes entitled to an instruction that the jury must believe that he is sane beyond a reasonable

acquitted by the jury solely on the ground of insanity, the court may certify the fact to the Federal Security Administrator, who may order such person to be confined in the hospital for the insane. * * *."

doubt. Insanity is an affirmative defense which must be alleged and proved like any other affirmative defense. In this case no insanity has been alleged except by the majority of this Court. It was not an issue at the trial. The issue is wholly created by the majority of this Court.

The climax of the majority opinion is in the following paragraph: "It should be noted that if appellant were ultimately acquitted on retrial because of insanity, he need not be set free but might be committed to a mental institution, thereby satisfying the interest of society both in the safety of the public and in the rehabilitation of the offender."

I wish that I might have the childlike faith and credulity to believe such a statement. But to any one old enough to read a newspaper, the melancholy history of these cases is all too plain. The asylums for the insane are overcrowded. They need the room. These sex criminals are received into the institution and in a few months are discharged as cured—and proceed to go right out and commit the same crime again possibly in an aggravated form.

We are all familiar with the case of the old sex criminal who murdered and raped one little girl here, caught a train for Baltimore and within a week committed an identical crime there.

In my settled judgment this is a sad day for the enforcement of the criminal law and for the safety of women and children in the District of Columbia.