229 F.2d 16
 Lolita LEBRON, Appellant,
v.
UNITED STATES of America, Appellee.
Rafael Cancel MIRANDA, Appellant,
v.
UNITED STATES of America, Appellee.
Andres Figueroa CORDERO, Appellant,
v.
UNITED STATES of America, Appellee.
Irving Flores RODRIGUEZ, Appellant,
v.
UNITED STATES of America, Appellee.
 No. 12317.
 No. 12318.
 No. 12319.
 No. 12320.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 27, 1955.
 Decided October 13, 1955.
 Petition for Rehearing Denied February 24, 1956.
 
 Messrs. Ben Paul Noble and James C. Toomey, Washington, D. C., with whom Mr. H. Hugo Perez, Washington, D. C., was on the brief, for appellants.
 Mr. John C. Conliff, Jr., Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis Carroll and John D. Lane, Asst. U. S. Attys., were on the brief, for appellee.
 Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.
 WILBUR K. MILLER, Circuit Judge.
 
 
 1
 The four appellants, who are Puerto Ricans and fanatical members of an anti-American political party on that island, had a meeting February 28, 1954, in New York, where they were then residing. They planned to go to Washington the next day for the purpose of visiting the Capitol and demonstrating for Puerto Rican independence by shooting at members of Congress. They arrived in the District of Columbia shortly after noon March 1 and after lunch proceeded to a gallery of the House of Representatives. Each was armed with a .38 calibre German pistol and together they had 90 rounds of ammunition. About 2:30 p. m., when 243 Congressmen were engaged in voting on the floor of the House, appellant Lolita Lebron arose, waved a Puerto Rican flag, shouted the imperative demand, "Free Puerto Rico," and began shooting. Her companions then stood and shot their pistols toward the floor of the House. Some 16 shots were fired and five Congressmen were wounded before the appellants were overpowered and disarmed.
 
 
 2
 They were indicted March 3 in ten counts, the first five of which charged them with assault with intent to kill (a separate count being devoted to the assault upon each victim) and the second five accused them of assault with a dangerous weapon. Upon arraignment the defendants pleaded not guilty and four able and experienced attorneys were appointed to represent them.
 
 
 3
 Trial began June 3 and was concluded June 17. Under the five counts charging assault with intent to kill, Lolita Lebron was acquitted, but her three male companions were found guilty and five consecutive sentences of from 5 to 15 years were imposed upon them. Under the five counts which charged assault with a dangerous weapon, all four appellants were found guilty and received five consecutive sentences of from 40 months to 10 years; those imposed upon the men to run concurrently with the longer terms they received on the other five counts.
 
 
 4
 On these appeals, diligent appointed counsel advance many reasons for reversal. Among them are the contentions that the trial court erred in refusing to order a psychiatric examination to determine defendants' mental competency to stand trial, and in refusing to submit to the jury the question whether the defendants were sane when they fired their pistols into the crowded well of the House of Representatives. These contentions are of course not identical and require separate consideration.
 
 
 5
 1. Concerning alleged mental incapacity to stand trial, the applicable statute is 18 U.S.C. § 4244, which in pertinent part is as follows:
 
 
 6
 "Whenever after arrest and prior to the imposition of sentence * * the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused * * * to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. * * *"
 
 
 7
 An attempt to invoke this statutory provision was made at the close of defendants' evidence, when one of associate defense counsel made this statement:
 
 
 8
 "If your Honor please, at this time it has occurred to us as counsel for these people, for these defendants, there is probably something mentally wrong with them.
 
 
 9
 "We are asking the Court at this time to have these people examined by psychiatrists other than those who Mr. Rover [the United States Attorney] had examine them. Because of the conversation, the testimony on the witness stand, and what the testimony was, their lack of remorse, their peculiar attitude towards this entire situation, that I am firmly convinced there is a strong probability that these people are mentally unstable."
 
 
 10
 Such a motion will not be granted if it is not made in good faith or if it is based upon a frivolous ground. Wear v. United States, 1954, 94 U.S.App. D.C. 325, 218 F.2d 24. The motion in this case, quoted above, fell short of meeting the statutory requirements as to the belief of the movant concerning the mental condition of the accused. Counsel did not say he had reason to believe and did believe that the defendants "may be presently insane" or otherwise so mentally incompetent as to be unable to understand the proceedings against them or to assist in their own defense. He merely said, "[I]t has occurred to us * * * there is probably something mentally wrong with them," and "I am firmly convinced there is a strong probability that these people are mentally unstable."
 
 
 11
 There may be something mentally wrong with an accused person or he may be emotionally unstable, and yet he may not be insane within the meaning of the statute and may be mentally competent to stand trial. We do not mean to say a motion under § 4244 must be couched in the exact language of the statute; but it is insufficient unless its recital approximates the meaning of the statutory language. Cf. Perry v. United States, 1952, 90 U.S.App.D.C. 186, 195 F.2d 37.
 
 
 12
 Even more importantly, the ground for the motion stated by the movant here was slight indeed, and of little weight or importance, and so was frivolous. It set forth no particulars and can be characterized as a statement of vague impressions. Moreover, the chief counsel for the defense had already told the court he had talked with the defendants many times and had no doubt as to their sanity. It should be noted too that soon after the shooting, the Government had the defendants examined by three psychiatrists who found them sane. They were not called upon to testify, but copies of their reports were furnished to defense counsel well in advance of trial. We hold the District Court did not err in denying the motion for a psychiatric examination.
 
 
 13
 2. In support of their contention that the District Court erred in refusing to submit to the jury the question of the defendants' sanity at the time of the shooting, it is pointed out that this court has twice said[1] that whenever there is some evidence of insanity, a factual issue for the jury is formed, and the Government must prove sanity in order to convict, just as it must prove every ingredient of the crime. Defense counsel argue that the very acts of the defendants in the House gallery were sufficient to raise an issue as to their sanity. They suggest also that testimony which described the male appellants as being "abnormally calm and anything but agitated" after the shooting, should be regarded as "some evidence" of insanity; but at the same time they say that testimony concerning Lolita Lebron's hysterical behavior before and during the shooting constituted "some evidence" of mental disorder so as to require the prosecution to prove sanity. Her notion that she was emulating George Washington is also emphasized. And appellants' adherence to an organized minority group in Puerto Rico is said to indicate irrationality.
 
 
 14
 The trial judge correctly held these considerations insufficient to raise an issue as to appellants' sanity. Moreover, the appellants themselves flatly refused to rely upon insanity as a defense; and at the close of the Government's case, chief counsel for the defense acknowledged that long before the trial he had received the reports of the three psychiatrists who had examined the appellants at the request of the Government and had found them to be of sound mind. He added, as we have seen, that he had talked to appellants many times and had no doubt as to their sanity.
 
 
 15
 3. The appellants say they were prevented from attempting to discover evidence to support a plea of insanity by the court's denial of their pre-trial motion that their counsel be authorized to "proceed with the investigation" at appellants' former places of residence — New York City and Puerto Rico — at the expense of the Government, because "No evidentiary information concerning their background, mental health and emotional stability, character and group identification, is available in the District of Columbia." Appellants cite no authority for such a fishing expedition at the expense of the United States, and we know of none. The denial of the motion was not error.
 
 
 16
 4. The trial judge is charged with error in refusing to declare a mistrial at the close of the evidence for the prosecution on the ground that each defendant was entitled to be represented by separate counsel. The point was raised at the trial when, at the close of the Government's case in chief, one of the associate counsel for the defense, saying the action was his own and not that of other counsel, moved as follows:
 
 
 17
 "I would like to move at this time for the withdrawal of a juror and the declaration of a mistrial on this basis: I feel that in an assigned case that each defendant is entitled to separate representation * * *.
 
 
 18
 * * * * * *
 
 
 19
 "That the defendants under the Constitution of the United States are entitled to independent representation, one assigned, when counsel are assigned by the Court * * *."
 
 
 20
 He added that at the stage of the trial then reached it appeared there might be "independent and separate defenses for * * * the defendants Miranda, Rodriguez and Lebron * * *."
 
 
 21
 Chief counsel for the appellants then stated:
 
 
 22
 "I think I should say this, if your Honor please: On at least two occasions we have discussed very carefully with each defendant, with the non-English speaking defendants through an interpreter, the question as to whether in the mind of any one of them there was any conflict of interest or difference of point of view, advising them that if that were so, I would suggest that we divide ourselves and one represent each of the four.
 
 
 23
 "On all or on each of two occasions they insisted that there was neither a conflict of interest, division of opinion, and that what they did they did jointly and they wanted to be defended by the four of us."
 
 
 24
 Thereupon the associate counsel who had made the motion observed:
 
 
 25
 "There is no disagreement between counsel. I am merely making the motion for the record, if your Honor please."
 
 
 26
 Appellants were not entitled to be represented by separate counsel unless there was some inconsistency in joint representation. Judge Morris guarded against the possibility of prejudice when he appointed the four attorneys and designated one as chief counsel and the other three as associate counsel: he stated that, if any conflict of interest should develop, he would apportion the attorneys among the several defendants. Counsel press the point on appeal but do not point out any conflict of interest, and we observe none.
 
 
 27
 5. With respect to the conviction of the three male defendants under the counts charging assault with intent to kill, counsel assert that "evidence of motive as bearing upon the negation of the intent to kill should have been admitted by the court below." They reason that since the prosecution may show motive in order to prove intent to kill, a defendant should be allowed to show a motive that indicates lack of such intent.
 
 
 28
 The male appellants were allowed to testify that they did not intend to kill the particular legislators who were shot — that they had no personal animosity toward them; they said, however, that they intended to kill members of Congress in order to draw attention to the alleged wrongs of Puerto Rico. Moreover, defense counsel overlook the fact that the law sharply limits the relevancy and materiality of motive in cases such as this. As we said in the Collazo case:[2]
 
 
 29
 "* * * If the fact of killing by an accused is in issue * * * the prosecutor is permitted * * * to prove that the accused had a motive * * *. Likewise, in such a case, the accused * * * is permitted to prove that he had no motive, no reason, for killing the deceased. * * * But, if a killing is purposed (intended) and none of the established legal excuses for purposed killing is pleaded, the motive of the killer is wholly immaterial. The courts frequently point out that not even the highest motive, outside the well-recognized legal justifications, is a defense to purposed killing. * *"
 
 
 30
 In addition to the arguments we have considered and rejected in the foregoing portion of this opinion, the appellants advance several other reasons for reversal. We have carefully considered these further contentions but regard them as so insubstantial as not to require discussion.
 
 
 31
 Though they were indigent strangers unable to speak our language, the appellants were ably represented by capable, conscientious counsel. The patient presiding judge permitted more than ten days to be consumed in their trial which, had the situation involved been less dramatic, could well have been completed in half that time. The jury's verdicts show they were the result of intelligent, dispassionate deliberation. Thus the appellants were afforded every protection which our law gives to any person charged with crime. Their guilt was clear, and their convictions must stand.
 
 
 32
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Tatum v. United States, 1951, 88 U.S. App.D.C. 386, 190 F.2d 612; Wright v. United States, 1954, 94 U.S.App.D.C. 307, 215 F.2d 498
 
 
 [2]
 Collazo v. United States, 90 U.S.App. D.C. 241, 247, 196 F.2d 573, certiorari denied, 1952, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364