Edward L. SMITH, Appellant,

v.

UNITED STATES of America,
Appellee.

Wayman R. CUNNINGHAM, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 19148, 19149.

United States Court of Appeals
District of Columbia Circuit.

Argued June 16, 1965.

Decided Nov. 4, 1965.

Petition for Rehearing in No. 19148
Denied Dec. 21, 1965.

Mr. Charles W. Halleck, Washington, D. C., with whom Mr. Howard F. Roycroft, Washington, D. C. (both appointed by this court), was on the brief, for appellant in No. 19,148.

Mr. J. Roger Wollenberg, Washington, D. C., with whom Mr. Arthur Z. Gardiner, Jr., Washington, D. C. (both appointed by this court), was on the brief, for appellant in No. 19,149.

Mr. Allan M. Palmer, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty. at the time the brief was filed, and Frank Q. Nebeker and Joseph A. Lowther, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

These appeals are from convictions of first degree murder (felony-murder), robbery, assault with a dangerous weapon, and carrying a dangerous weapon—all arising out of the same incident.

Near one o'clock on the morning of January 24, 1964, appellants Smith and Cunningham, armed with pistols, entered Natoli's Delicatessen in the District of Columbia. While holding the proprietor and several customers at gunpoint, they

began to remove the cash from the cash register. Before they finished, however, two police officers arrived and attempted to thwart the robbery. A gunfight ensued during which one of the officers was killed and appellant Cunningham was seriously wounded. Appellant Smith fled and was arrested about an hour later sitting with his wife in a parked car several miles from the scene of the crime.

I

The circumstances of appellant Smith's arrest must be stated in some detail in order to appraise his claim that the arrest was made without probable cause. It appears that Police Detective Eger arrived at the scene of the crime a very short time after Smith had fled. While there he heard a police broadcast describe Cunningham's accomplice as "a Negro male, 25 to 35, five-three to five-four, dark brown complexion, has pants rolled up to the top of his shoes, dark sunglasses, grey cap, three-quarter length dark grey coat, brogan shoes." One of the other police officers at the scene gave Detective Eger an address found on Cunningham, and Eger and three other officers immediately set out for that address. They there learned that they might get more information about Cunningham from his sister, who resided at 4227 H Street, S. E., Washington, D. C.

Upon arriving at the 4200 block of H Street, Detective Eger noticed a car parked with its motor running. He walked over and tapped on the window. The detective testified that when the window was rolled part of the way down, he recognized the operator of the car as fitting the broadcast description. He asked the man, later identified as appellant Smith,

several questions. When he received evasive answers, Eger ordered Smith to produce his driver's permit. The other police officers had meanwhile surrounded the car. Before he could produce the permit, Smith was ordered to get out of the car, and as he got out Detective Eger saw a pistol in his belt. Eger thereupon formally placed Smith under arrest and searched him. The search disclosed two other pistols and two wallets which had been taken from persons in the delicatessen.

On appeal, Smith's argument centered around the proposition that Detective Eger, when looking through the partially opened window of Smith's car in the middle of the night, could not possibly have recognized Smith as meeting the description given in the police broadcast. It was Eger's clear testimony, however, that he did so recognize Smith. Whether he actually did or not was a question of credibility which, having been resolved on sufficient evidence in favor of the Government by the trial judge, will not be disturbed on this appeal. With such recognition, supported by the other information which led them to the scene of the arrest, the police had sufficient evidence to arrest Smith on the spot[1] and to conduct the search incident thereto.

II

Appellant Smith requested instructions submitting to the jury the question of his mental responsibility at the time the fatal shots were fired. His theory was that, if at some time during the course of the robbery he became insane in the legal sense,[2] then at that time his culpable participation in the felony would have ended. If such insanity had

---

1. The arrest in this case was made, not when Detective Eger approached Smith's car and asked him questions, but when the other police surrounded Smith's car, thereby effectively precluding further movement of the car by Smith. Cf. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Consequently, the evidence discovered subsequent to that time may not be considered in determining probable cause. We find,

however, that the evidence in Detective Eger's possession at the time the police surrounded the car was sufficient to sustain the arrest.

2. See McDonald v. United States, 114 U.S. App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (en banc): "[A] mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls."

overtaken him before the killing, he contends, he should not be held responsible for the felony-murder.

The Government, both during the trial and on appeal, takes no issue with appellant Smith's theory as such. Its position, which prevailed below, is that the trial judge was not required to give the requested instructions since the issue of Smith's mental condition was not raised by sufficient evidence.

Evidence on the insanity issue consisted solely of the expert testimony of defense witness Dr. Mauris M. Platkin. After establishing that Dr. Platkin had examined appellant Smith at St. Elizabeths Hospital, defense counsel referred to a psychiatric diagnosis rendered in 1946 which stated that Smith was at that time "a bit unusual in that he shows no moral sense of any kind which is unusual with his intelligence." It further stated, "He can be classified as an immaterial [sic] adolescent with neurotic traits." Smith's experiences as a professional boxer during 1951 and 1952, including his being knocked unconscious during four bouts, and some facts concerning Smith's unstable family background and disorganized early years[3] were brought out during the examination of Dr. Platkin. Finally, defense counsel read a report by a psychologist who had recently examined Smith at St. Elizabeths Hospital. The report stated:

"Superficially this is a hostile, defiant resentful young man with the inconsistencies and ambivalence evident in the test protocol evidences a need for support, recognition and security from others.

"Nevertheless, he is becoming progressively more pessimistic regarding the finding of any satisfactory solution to his problems. He appears to be calloused, evasive and guarded in his relationships, and if the current trend is not interrupted, he is likely to evolve a schizophrenic solution to his difficulties."[4]

Counsel then propounded a lengthy hypothetical question which assumed all the facts of the crime and which culminated in the following colloquy:

"Q [by defense counsel] Doctor, would you say with any degree of psychiatric certainty, whether or not the defendant Smith at [the moment the killing took place] actually had any control over his actions * * ?

"A [by Dr. Platkin] I think this would be speculation again."

On cross-examination, Dr. Platkin testified that, in his opinion, appellant

---

3. Dr. Platkin testified: "It was a disorganized life. I think his father left the family or he knew nothing about his real father, in fact, and that he was buffeted and moved about quite a bit, living in one and then in another home."

4. Counsel's stated purpose for using the psychiatric reports and the background facts in examining Dr. Platkin was to test whether the doctor had taken sufficient account of them in reaching his conclusion. When defense counsel offered the 1946 report, Government counsel objected, stating:
   "MR. LOWTHER [Government counsel]: Your Honor, what I am getting at is, it seems to me counsel is endeavoring to get in by indirection the diagnosis of someone else who is not here, through this physician here.
   "MR. HALLECK [defense counsel]: The background of this man and his entire history is relevant, Your Honor.

It is not being put in for the truth of the matter contained but for the material that was made available to this doctor and upon which he based his diagnosis." (Emphasis added.)
However, defense counsel immediately made clear that "I believe it [the 1946 report] is relevant in here inasmuch as it is made available; if he [the psychiatrist] considers that in making his determination it is perfectly proper and relevant. This is part of the history and background of this man." Later, in arguing for the instruction on responsibility, defense counsel stated that there was sufficient evidence presented. "I refer particularly to the psychologist's report from St. Elizabeth's Hospital which Dr. Platkin referred to in his notes, which indicates that under conditions of sufficient stress that this defendant could likely evolve a psychotic solution to his problems."

Smith was without mental disease or defect at the time of the offense.

On redirect, the following took place:

"Q [by defense counsel] Doctor, can you say unequivocally that the defendant Smith did not suffer from an acute or momentary psychotic episode in that store when that police officer advanced toward him firing this gun?

"A [by Dr. Platkin] I would say it is highly improbable. I never heard of such a brief psychotic episode.

"Q Could a psychotic episode be triggered at that point which continued on for some period of time?

"A Not very probable, not in my experience. It does not fit with what I know and understand of psychiatric conditions and with what I am familiar with from the psychiatric literature.

"Q· Can you say unequivocally that it did not occur, or are you saying that it is just not probable?

"MR. LOWTHER [Government counsel]: I think he says as a physician it was improbable. The doctor has been asked that and I object to the question again as being repetitious.

"THE COURT: You may ask the question.

"THE WITNESS: I cannot say with 100 per cent certainty. I say that

it is highly improbable in the light of my own experience and with the familiarity with the literature that I have and from what I understand from it, and from dealing with my other patients."

■ On this record, it is unlikely that any jury would have a reasonable doubt regarding appellant Smith's responsibility for the crime. This, however, is beside the point. It has been the consistent teaching of our past cases that whenever "some evidence"[5] of mental disease or defect is presented, the question of responsibility must be answered by the jury.[6] Therefore, the question before us is whether the evidence in this case required the mental issue to be submitted to the jury.

■ Appellant relies upon the 1946 diagnosis and the report of the St. Elizabeths psychologist as providing "some evidence" of mental disorder. This court, in Lyles v. United States, 103 U.S.App. D.C. 22, 28, 254 F.2d 725, 731 (1957) (en banc), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), held that a report containing a psychiatric opinion could not be admitted into evidence as a record under the Federal Shop Book Act, 28 U.S.C. § 1732. While an expert who testifies that the defendant was not suffering from a mental disease or defect can be questioned about reports he considered in reaching that conclusion,[7] this alone does not convert the reports into affirmative evidence of in-

---

5. In McDonald v. United States, *supra* Note 2, we described "some evidence" as "more than a scintilla, yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal." 114 U.S.App.D.C. at 122, 312 F.2d at 849.

6. McDonald v. United States, *supra* Note 2; Hawkins v. United States, 114 U.S. App.D.C. 44, 310 F.2d 849 (1962); Logan v. United States, 109 U.S.App.D.C. 104, 284 F.2d 238 (1960); Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612 (1951); compare Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665 (1945), cert. denied, 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774 (1948).

7. In *Lyles* itself, as in this case, see text pp. 840–841 *supra*, defense counsel was allowed to establish the nature of the reports and their findings by questioning experts who had considered the reports but had reached opposite conclusions. Tr., Vol. III, pp. 243, 248–249, Vol. IV, p. 279; Lyles v. United States, *supra*. It is also open to both sides to question an expert about what weight he gave to a report and why. See Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957); Rollerson v. United States, 119 U.S.App.D.C. 400, 402, 343 F.2d 269, 271 (1964).

sanity.[8] Competent counsel for the defendant, being familiar with this principle, did not offer the reports for this purpose.[9]

■■■ Nor is there any indication in the record that the knockouts as a boxer or Smith's unstable family background and disorganized youth affected his mental condition. Thus, when boiled down to its essentials, the claim that a question of mental responsibility exists on this record rests on the fact that Dr. Platkin did not categorically deny the possibility of Smith's "temporary insanity" during the criminal venture. Dr. Platkin did, however, deny the likelihood of such temporary insanity in as strong language as his knowledge of the science of psychiatry would allow. He said "it is highly improbable" and he "never heard of such a brief psychotic episode." Thus appellant Smith's theory was not supported by any credible testimony in the record. Moreover, it was discredited by the only psychiatric witness appearing in the case.[10]

■■■ While our decided cases have constantly emphasized the importance of leaving the issue of mental responsibility to the jury, they have consistently recognized that it takes something more than a mere claim of irresponsibility on the part of the defendant to raise the issue.[11] The negative inference which appellant Smith seeks to draw from Dr. Platkin's all but certain testimony against him did not raise a real question concerning Smith's mental condition at the time of the crime. Therefore, the trial judge did not err in refusing Smith's requested instructions.

■■■ Appellant Cunningham also contends on appeal that the trial judge erred in not giving the insanity instruction on his behalf. During the trial, however, he neither requested the instruction [12] nor introduced any evidence on which such an instruction could be based. The evidence which entered the record in connection with the hearing on his competency to stand trial was not such that we can say that the trial judge abused his discretion in not *sua sponte* raising the insanity issue. *Cf.* Whalem v. United States, 120 U.S.App.D.C. 331, 337–338, 346 F.2d 812, 818–819 (1965) (*en banc*).

---

8. Of course, a psychiatrist can affirmatively rely upon the report of a psychologist when reaching a conclusion concerning the mental condition of a defendant. Jenkins v. United States, 113 U.S.App. D.C. 300, 307 F.2d 637 (1962) (*en banc*) (superseding the earlier holding in Logan v. United States, *supra* Note 6). And the jury is not bound by the conclusions of an expert about the existence or nonexistence of a mental disease or defect but may consider the facts that underlie that opinion. McDonald v. United States, *supra* Note 2; Hawkins v. United States, *supra* Note 6; Blocker v. United States, 116 U.S.App.D.C. 78, 320 F.2d 800, cert. denied, 375 U.S. 923, 84 S.Ct. 269, 11 L. Ed.2d 167 (1963).

9. See Note 4 *supra.*

10. The mere absence of expert psychiatric testimony on the issue of mental responsibility is not, of course, fatal to a plea of insanity. We have in several cases held that lay testimony must be considered in evaluating a defendant's mental state. Naples v. United States, 120 U.S.App.D.C. 123, 130, 344 F.2d 508, 515 (1964); Ta-

tum v. United States, *supra* Note 6. But such cases are to be distinguished from the situation here where the only real evidence is adverse psychiatric testimony.

11. "The subject matter being what it is, there can be no sharp quantitative or qualitative definition of 'some evidence.' Certainly, it means more than a scintilla * * *." McDonald v. United States, *supra* Note 2, 114 U.S.App.D.C. at 122, 312 F.2d at 849. Compare Lebron v. United States, 97 U.S.App.D.C. 133, 229 F.2d 16 (1955), cert denied, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492 (1956); Wright v. United States, 94 U.S.App. D.C. 307, 215 F.2d 498 (1954).

In Tatum v. United States, *supra* Note 6, 88 U.S.App.D.C. at 390, 190 F.2d at 616, we said: "[T]he function of the trial judge in regard to the issue of sanity is to determine whether that issue is brought into the case *by evidence.*" (Emphasis added.)

12. Compare Wilson v. United States, 109 U.S.App.D.C. 337, 288 F.2d 121 (1960).

### III

Appellant Smith seeks reversal of his conviction of carrying a dangerous weapon in violation of 22 D.C.CODE § 3204 (1961).[13] His contention is that evidence showing he did not have a license to carry the weapon was erroneously admitted over objection of counsel. This evidence was a document reading as follows:

"The Government of the District of Columbia

Metropolitan Police Department

October 27, 1964

This is to certify that all records for application to carry a pistol, of the Metropolitan Police Department, have been searched for the following described person:

Edward Lester Smith,

4227 H Street, S.E.

Male, Negro, 34.

According to the records of this Department, the above-named person did not have on January 24, 1964, a license to carry a pistol in the District of Columbia, nor does he now have such a license.

Certified as correct by:

George P. Wallrodt

Deputy Police Chief

Acting Executive Officer"

Rule 27, FED.R.CRIM.P., incorporates by reference Rule 44, FED.R.CIV.P.[14] Rule 44(b) provides:

"A written statement signed by an officer having the custody of an official record or by his deputy that after diligent search no record or entry of a specified tenor is found to exist in the records of his office, accompanied by a certificate as above provided [i. e., that the officer has custody of the

records], is admissible as evidence that the records of his office contain no such record or entry."

The document in question here, being a certification of the Deputy Police Chief, fulfills all the requirements of this rule, except perhaps the requirement of a certificate that the Police Chief has custody of the records of such licenses. While no reason appears to excuse the Government's failure to produce this certificate, we do not think it should be held prejudicial error in this case. That custody of the records is in the Police Chief is a fact of which we can take judicial notice under the circumstances of this case. See 22 D.C.CODE § 3206 (1961).

### IV

Finally, appellant Cunningham contends that the trial judge erred in refusing to dismiss his appointed counsel and appoint another attorney when Cunningham requested him to do so prior to trial. Some time before the trial, Cunningham got the impression that his appointed counsel had improperly sought compensation from Cunningham's mother and, as a result, he refused further cooperation with counsel. The impression was apparently generated by what the trial judge found to be a misunderstanding. Before requesting the court to appoint a psychiatrist to examine Cunningham, counsel had asked Cunningham's mother if she could pay for psychiatric services on her son's behalf. Cunningham apparently believed that the attorney had requested money for himself. When Cunningham refused to cooperate with him, counsel moved to withdraw from the case. This motion was denied after hearing by the trial court.[15]

Ten days before his trial, about three weeks after denial of counsel's motion to

---

13. 22 D.C.CODE § 3204 provides:
"No person shall within the District of Columbia carry either openly or concealed on or about his person * * * a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed. * * *"

14. See Notes of Advisory Committee on Rules, Rule 27, FED.R.CRIM.P.

15. Assigned counsel subsequently obtained funds from the court to hire a psychiatrist. The psychiatrist, however, after examining Cunningham, reported that he was not suffering from mental disease or defect.

withdraw, Cunningham moved the court for new counsel. He did not, in this motion, charge that counsel had been guilty of any misconduct, but merely stated that he desired new counsel because his present counsel did not want to represent him. This motion was denied on the morning of the trial after the court gave Cunningham full opportunity to say anything he wished about the matter.

Two contentions are made on appeal. First, it is claimed that in these circumstances 18 U.S.C. § 3005 gave Cunningham a statutory right to appointment of additional counsel.[16] Second, Cunningham claims that, in any event, under the circumstances, the trial judge abused his discretion in not appointing new counsel.

■■■■■ Dissatisfaction with appointed counsel was not the concern of Congress at the time it enacted 18 U.S.C. § 3005. The provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower. See Crum v. Hunter, 10 Cir., 151 F.2d 359 (1945), cert. denied, 328 U.S. 850, 66 S.Ct. 1117, 90 L.Ed. 1623 (1946). If the substance of his request had been that he desired the appointment of additional counsel, then Cunningham essentially would have been invoking the statutory provisions, and additional counsel would have been required. Section 3005 provides an absolute right to additional counsel when requested. Cunningham's motion, however, was not for additional counsel, but for new counsel based on his dissatisfaction with his appointed counsel and, hence, was addressed to the sound discretion of the trial court.

■■■■ On review of the court's exercise of that discretion, we will not speculate on how the situation could better have been handled. Certainly it would have been appropriate, because of the misunderstanding between Cunningham and his counsel, to appoint new counsel to represent him. We cannot say, however, under the circumstances of this case, that the trial judge, in failing to do so, abused his discretion.[17] In fact, appointed counsel's defense of Cunningham, as shown by this record,[18] confirmed the action of the trial judge.

■■■■ Cunningham contends that, in any event, the trial court should have advised him of his right under 18 U.S.C. § 3005 to have a second counsel appointed. An accused's right to additional counsel

---

16. 18 U.S.C. § 3005 provides:
    "Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel learned in the law; and the court before which he is tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire, who shall have free access to him at all reasonable hours. * * * *"

17. Our affirmance of the court's action with respect to Cunningham's counsel does not include approval of the following colloquy between the court and Cunningham:
    "THE COURT: * * * I want you to understand that once you ask the Court to appoint counsel, that is it. And you are not going to control the situation. You understand that, don't you?
    "DEFENDANT CUNNINGHAM: That's right. I am not trying to control the situation.
    "THE COURT: You understand it. I understand it. And we all understand it.

    Mr. Klavan [Cunningham's counsel], in the circumstances, reluctant as I am naturally, we cannot permit these people to direct or control the appointment of counsel. Just because they don't like an individual they think they no longer need us. That is very unfortunate. That is the way it is going to be. Thank you very much."

18. Counsel challenged the adequacy of the mental examinations that had been given his client, objected to the inability of some of the doctors to give the bases for their conclusions, and moved that Cunningham be re-examined so that the doctors could testify "in an evidentiary fashion rather than a conclusionary fashion." Counsel was alert to protect Cunningham against prejudice as a result of his being tried with appellant Smith, was successful in suppressing certain evidence seized from Cunningham in violation of his rights, and sought to present expert testimony about the wisdom of applying the death penalty to his client.

in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005.[19] We presume prejudice from the failure of the trial court so to inform him. However, in this case the presumption is overcome by appointed counsel's vigorous defense of Cunningham's rights.[20] Considering the fact that there was no challenge to the overwhelming evidence of guilt, it is apparent that, in obtaining a sentence of life imprisonment rather than death by electrocution, counsel obtained for Cunningham all that could have been hoped for under the circumstances.

Affirmed.

BAZELON, Chief Judge (concurring in part and dissenting in part).

I concur in Judge Wright's opinion except that I think the failure to charge the jury on defendant Smith's mental responsibility was error requiring a new trial.

I agree that no affirmative evidence of mental disorder is derived from the failure of Dr. Platkin to "say unequivocally that the defendant Smith did not suffer from an acute or momentary psychotic episode in that store when that police officer advanced toward him firing this gun." Nor is such evidence found in the testimony concerning the defendant's unsettled background and his four knockouts, without proof of any resulting symptoms of a mental disease. But there was more before the jury. A 1946 psychiatric report—not further described in

the record—had found that the defendant "shows no moral sense of any kind which is unusual with his intelligence. He can be classified as an immaterial [sic] adolescent with neurotic traits." In addition, and more importantly, in connection with the pre-trial examination at Saint Elizabeths Hospital in the present case, a Hospital staff psychologist reported that the defendant "is likely to evolve a schizophrenic solution to his difficulties."

Even if these reports are admissible as affirmative evidence, they would not be likely to create a reasonable doubt of responsibility in the minds of the jurors. However, as the majority states, "this * * * is beside the point." "[I]n criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."[1] There must be "more than a scintilla [of evidence], yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal."[2] I do not understand the majority to disagree that, if the reports in question are affirmative evidence, an instruction on the issue of responsibility would clearly be required.[3]

But my brethren say that these reports are admissible only for the purpose of testing credibility. Their view is that our decision in Lyles v. United States, 103 U.S.App.D.C. 22, 28, 254 F.2d 725, 731 (1957) (en banc), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958),

19. Barkan v. United States, 7 Cir., 305 F.2d 774, cert. denied, 371 U.S. 915, 83 S.Ct. 261, 9 L.Ed.2d 173 (1962), and United States v. Morris, E.D.Pa., 178 F.Supp. 694 (1959), affirmed per curiam, 3 Cir., 277 F.2d 927, cert. denied, 364 U.S. 848, 81 S.Ct. 91, 5 L.Ed.2d 72 (1960), reached an opposite result. However, since the conclusion was merely stated without any reasons, we find those opinions unpersuasive.

20. See Note 18, supra.

1. Tatum v. United States, 88 U.S.App.D.C. 386, 391, 190 F.2d 612, 617 (1951).

2. McDonald v. United States, 114 U.S.App. D.C. 120, 122, 312 F.2d 847, 849 (1962) (en banc); accord, Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849 (1962); Tatum v. United States, 88 U.S.App.D.C. 386, 390, 190 F.2d 612, 616 (1951).

3. See, e.g., Hawkins v. United States, supra note 2; Goforth v. United States, 106 U.S.App.D.C. 111, 269 F.2d 778 (1959); Tatum v. United States, supra note 2.

precludes reliance on the reports as affirmative evidence. I cannot agree. I think this view unnecessarily and unwisely extends the holding of that case. *Lyles,* decided by a bare majority, placed this court in opposition to the "vast majority of courts [which] readily admit not only routine observations by medical personnel in a hospital record but also diagnoses of a patient's physical and mental condition." [4] Application of the decision often results in a disruption of hospital operation with no substantial gain for the trial process.[5] It should be limited and not extended, as the court does today.

*Lyles* held only that neither a 10 nor a 20 year old psychiatric report could be admitted into evidence merely as a hospital record.[6] The court reasoned that a presentation by a custodian did not provide a sufficient guarantee of the inherent reliability of the report, and that the absence of "any witness" to testify concerning the content of the report prevented any opportunity for challenging it.[7] Applied to the present case, this reasoning might foreclose reliance on the 1946 report, but clearly does not affect the Saint Elizabeths psychologist's report.

The defendant had been committed before trial to Saint Elizabeths for a mental examination. Sound and accepted standards of hospital practice require that a psychologist administer tests, examine the subject, and report his findings which are an essential consideration for diagnosis.[8] Following this procedure here, the Hospital chose the psychologist who participated in the examination required by the court. Admission of his report was not sought solely because it was a Hospital record. The defendant claimed the report provided some evidence of insanity primarily because Dr. Platkin, a psychiatrist from Saint Elizabeths, was required to and did consider the report in reaching his conclusion on the question of mental capacity to which he testified. He was in a position to provide the information necessary to satisfy the reasonable needs of cross-examination concerning the qualifications of the psychologist, the manner in which such examinations are usually given, the data obtained, and the validity of the conclusions reached. Therefore, *Lyles* does not bar affirmative reliance on this report.

Furthermore, I think that extension of *Lyles* is inconsistent with the accepted principle that, since the issue of responsibility is ordinarily for the jury, it is free to weigh the evidence which an expert considered and to reach contrary conclusions thereon.[9] Unless the expert witness informs the jury of the facts and material he considered, his testimony is of little value.[10] In the present case, the jury should have been given the opportunity to weigh the expert witness's opin-

4. Note, 48 Col.L.Rev. 920, 929 (1948), quoted in Lyles v. United States, 103 U.S. App.D.C. 22, 33, 254 F.2d 725, 736 (1957) (*en banc*) (dissenting opinion), cert. denied, 356 U.S. 961, 78 S.Ct. 997 (1958).

5. 6 Wigmore, Evidence § 1707 (3d ed. 1940).

6. See Transcript, Vol. III, pp. 248–249, Vol. IV, p. 279, Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957) (*en banc*), cert. denied, 356 U.S. 961, 78 S.Ct. 997 (1958).

7. Lyles v. United States, *supra* note 6, 103 U.S.App.D.C. at 28, 254 F.2d at 731.

8. See Judicial Conference of the District of Columbia Circuit, Report of the Committee on Problems Connected With Mental Examination of the Accused in Criminal Cases, Before Trial 32 (March 1965); Graham, McNaghten to Jenkins, 2 Insights: Quarterly Review of Religion and Mental Health 18–19 (1964); Sargent & Mayman, *Clinical Psychology,* in American Handbook of Psychiatry 1722 (1959).

9. McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847 (1962) (*en banc*); Hawkins v. United States, 114 U.S.App. D.C. 44, 310 F.2d 849 (1962); Blocker v. United States, 116 U.S.App.D.C. 78, 320 F.2d 800, cert. denied, 375 U.S. 923, 84 S.Ct. 269, 11 L.Ed.2d 167 (1963).

10. See Carter v. United States, 102 U.S. App.D.C. 227, 236, 252 F.2d 608, 617 (1957); Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269, 271 (1964).

ion in the light of all the material he considered, particularly that which would support a contrary opinion, and thereupon accept or reject his testimony. By taking the issue from the jury, however, the trial judge held the witness's opinion correct as a matter of law and therefore binding on the jury. If *Lyles* does require this result, its reconsideration and abandonment are long overdue.