**Raymond Edward CRAWN**

v.

**UNITED STATES of America.**

**Civ. No. 8864.**

United States District Court
M. D. Pennsylvania.

March 7, 1966.

Paul A. Barrett, Nogi, O'Malley & Harris, Scranton, Pa., for petitioner.

Bernard J. Brown, U. S. Atty., Scranton, Pa., for government.

SHERIDAN, Chief Judge.

This is a motion pursuant to Title 28 U.S.C.A. § 2255 by Raymond Edward Crawn to vacate and set aside his five year sentence of imprisonment.

On January 8, 1964, Crawn appeared with court-appointed counsel before Judge William J. Nealon of this district and pleaded guilty to an information to No. 13923 Criminal, charging him with interstate transportation of a stolen motor vehicle in violation of Title 18 U.S.C.A. § 2312. The offense was committed on December 9, 1963. On February 20, 1964, Crawn, with the same counsel, appeared before this court, and was sentenced to the five year term of imprisonment. He was delivered to the United States Penitentiary at Lewisburg, Pennsylvania (Lewisburg), on February 22, 1964. On March 2 and 14, and April 10 and 22, 1964, Crawn filed documents which were considered as motions for a reduction of sentence under Rule 35 of the Federal Rules of Criminal Procedure, and were denied.

On February 11, 1965, he filed the instant motion to vacate and set aside the sentence on the ground that at the time of his plea and the adjudication and sentence he was insane. A rule to show cause why the motion should not be granted was issued.[1] On March 4, 1965, Crawn was transferred from Lewisburg to the Medical Center For Federal Prisoners, Springfield, Missouri (Springfield).[2] A hearing was held in Scranton on August 3, 1965. Crawn was brought in from Springfield for the hearing and was represented by the same counsel who had represented him in the criminal action. Crawn testified on his own behalf, and Dr. David Rothstein, staff psychiatrist at Springfield, testified for the Government. The Crawn records of the Springfield institution were admitted into evidence. These included pertinent records developed during Crawn's incarceration in Lewisburg and during his previous confinements in New Jersey penal institutions and in the New Jersey State Hospital at Trenton, New Jersey. Certain other medical records, some of which were included in the Springfield records, forwarded by New Jersey officials prior to the hearing to the United

---

1. On March 16, 1965, the Government filed a motion, which was granted, to extend the time to April 16, 1965, in which to plead or make motions. No answer or motion was filed. At the hearing on August 3, 1965, the Government appeared and contested the allegations.

2. This transfer was apparently initiated by prison authorities because of Crawn's behavior. It was not initiated by the court.

States Attorney for this district, were also admitted into evidence. At this point, neither petitioner nor his counsel requested appointment of a defense psychiatrist, and neither requested copies of the transcript, documentary evidence or time to file a brief.

By separate letters received on August 20, 1965, Crawn requested this court to withhold any decision in this matter until he filed a brief, and requested the Clerk of this court to forward to him a transcript of the hearing and the New Jersey State Hospital records admitted into evidence during the hearing so that he could prepare a brief. On August 30, 1965, he filed a motion to obtain the transcript of the hearing and various psychiatric reports developed during his confinements in New Jersey and at Lewisburg. His stated intention in obtaining these documents was to use them in the preparation of a brief. Since it appeared that these communications were made without the knowledge or advice of counsel, on September 23, 1965, it was ordered that the requested documents be forwarded to counsel for his consideration and preparation of a brief within 30 days of the receipt of the documents. A petition for appointment of a psychiatrist received on September 20, 1965, also filed without counsel's knowledge, was forwarded to counsel for consideration and for a report to the court in 30 days.

On October 11, 1965, he filed a petition to discharge counsel on the ground that he was incompetent, and requested that he be allowed to proceed in *propria persona*. This was denied. This petition prompted counsel to counter with a motion to withdraw, action on which was held in abeyance.

At this point Crawn, apparently dissatisfied with the determination that he would not be permitted to proceed without counsel, began to file or forward copies of a number of documents in which he sought to obtain from the court or counsel copies of documents ordered to be forwarded to counsel. In these he attacked the competence of counsel.

Those in the nature of petitions he filed with the court were denied. On November 22, 1965, he renewed his request for appointment of a defense psychiatrist.

Since, on October 25, 1965, the Government had filed its notice of compliance with the court's order that the requested documents be turned over to counsel, and since the 30 day period allowed from that date for the filing of a brief expired on November 24, 1965, counsel was contacted relative to the brief. Counsel stated that he took no action on the court's orders because he was under the impression that action on his motion for withdrawal was necessary before he proceeded. He further stated that the attacks on him by Crawn created a situation in which he believed that he could not properly represent Crawn. In view of this misunderstanding and these statements, on December 7, 1965, his motion to withdraw was granted and new counsel was appointed and given time in which to review the case and file a brief. This apparently satisfied Crawn because he then withdrew several petitions aimed at obtaining the documents in the hands of his former counsel.

On January 10, 1966, however, Crawn renewed his petition for appointment of a defense psychiatrist, the petition concerning which his former counsel also neglected to report to the court. Since this petition was initially presented without the knowledge of counsel, his present counsel was requested to consider this petition and to inform the court on the action he would request the court to take. Present counsel requested that action on the petition for appointment of a psychiatrist be held in abeyance until his brief was filed. Petitioner's brief was filed on January 20, 1966. The Government's brief was filed on January 25, 1966.

*The Merits.* Crawn relies on Section 4244 of Title 18 U.S.C.A., which provides generally that when, after arrest and before sentence, the United States Attorney has reasonable cause to believe a defendant may be insane or so mentally incompetent as to be unable to under-

stand the proceedings against him or to assist in his defense, he shall file a motion with the court for a determination of such competency and upon such motion the court shall appoint a psychiatrist to report to the court. The court may also follow the procedure on its own motion. It is petitioner's contention that he was insane at the time of his plea and sentence, and since in the past he had been committed to mental hospitals and adjudicated insane, the court erred in accepting his plea and sentencing him without first inquiring into his mental competency.

There is no doubt that petitioner has had a past history of mental illness. On September 5, 1956, at the age of 16, he was committed to Annandale Reformatory in New Jersey for breaking and entering. On November 15, 1956, he was transferred to the New Jersey State Hospital in Trenton where his condition was diagnosed as "Schizophrenic Reaction, Paranoid Type." He was returned to Annandale on April 30, 1957. On the following day he was again transferred to the hospital where his condition was further diagnosed as "Sociopathic Personality Disturbance, Anti-Social Reaction," and was returned again to Annandale on July 11, 1957. On December 26, 1957, it was concluded there was a remission from his psychosis. He was paroled from Annandale on March 17, 1958.

About two months later, in May 1958, Crawn was again arrested for breaking and entering in New Jersey, and on July 15, 1958, he was sent to the New Jersey State Hospital where his condition was diagnosed as "Sociopathic Personality Disturbance, Anti-Social Reaction." At this time it was decided that he would not fit into a psychiatric hospital, and it was recommended that he be treated in a correctional institution. On October 1, 1958, he was transferred to the Warren County Jail and from there to the Bordentown Reformatory. Within a few days of his commitment, however, on October 7, 1958, he was again transferred to the hospital, where his condition continued to be diagnosed as

"Schizophrenic Reaction, Residual Type." He was adjudged legally insane on January 8, 1959. He remained at the hospital until May 25, 1960, when he was returned to Bordentown. He cut his wrists on a mattress and was found inaccessible when spoken to by the Reformatory's psychiatrist. On the following day, May 26, 1960, he was returned to the hospital. The hospital's admission note at this time indicated:

"On admission the patient did not offer any complaints, he was neat, tidy and clean in his personal appearance. The patient had a very small laceration over his left forearm and no stitches were necessary. The patient was in good contact with his environment and he has a good grasp of his surroundings. He was correctly oriented to time, place and person. He was responsive but not overly alert or communicative. He answered questions relevantly although he did not elaborate much. No hallucinations or delusions could be elicited. The patient seemed to be dull and indifferent to some extent. He didn't show any evidence of depression and the patient stated he did not like it in the N. J. Reformatory at Bordentown and for this reason he cut his wrist so that he could be sent back here. Patient stated he cut his wrist purposely and deliberately."

On August 18, 1960, he was again adjudged legally insane. He was returned to Bordentown on April 26, 1961. From this time until the commission of the instant offense, Crawn was not hospitalized for any mental difficulty.

On October 11, 1961, he was paroled from Bordentown. Three days later he was charged with assault on a neighbor, and on October 15, 1961, he was returned to Bordentown as a parole violator. On January 16, 1962, he was transferred to the New Jersey State Prison Farm, Rahway, New Jersey, and on November 27, 1962, to the New Jersey State Prison. He was discharged from the New Jersey State Prison at the expiration of his maximum sentence on February 9, 1963.

On February 12, 1963, he was sentenced to three months in the Warren County, New Jersey jail for disorderly conduct. In Stroudsburg, Pennsylvania, in June and July 1963, he was fined for drunk and disorderly conduct, and in November 1963, he served 30 days in Warren County for breaking and entering. In summary, at the time of his arrest for the offense for which he is serving his present sentence, Crawn had been free from penal or hospital confinement only about eight months of the seven and one-quarter years beginning September 1956.

At the time of the plea of guilty, Judge Nealon did not have before him any evidence of petitioner's past history of mental difficulties. The record of the arraignment shows that Crawn was present in court with counsel, answered in the affirmative all questions by the Assistant United States Attorney as to whether he understood the charge, discussed it with counsel, and waived presentation to the grand jury. He signed the waiver and plea without difficulty. He answered "guilty" when asked how he pleaded. When asked for his place of residence, he stated "Blairstown, New Jersey." Blairstown, in Warren County, was the place from which the stolen automobile had been transported and an address indicated in various prison and hospital reports as his address. It is also the place he once attended school. He had quit in the eighth grade. Neither the Government, Crawn nor his attorney indicated any past mental difficulties. In fact, the Government states that it knew of none, and that Crawn showed no sign of incompetence during his imprisonment in the Lackawanna County Jail from the time of his arrest in December 1963.

At the time of his sentence, however, this court did have before it, as part of the pre-sentence report, the fact of Crawn's hospitalization for mental difficulties and the fact that he had been adjudicated insane, although most of the detail disclosed above was not before the court. Since neither the Government, nor Crawn, nor his counsel made a motion for a determination of his competency, should the court have sought on its own motion such a determination in view of the information in its possession?

Crawn does not raise the question of his sanity at the time the crime was committed. The test in determining whether his plea should have been accepted and sentence imposed is whether he had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he had a rational as well as a factual understanding of the proceedings against him. Dusky v. United States, 1960, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824. That there may be something mentally wrong with a defendant or that he may be emotionally unstable does not necessarily render him mentally incompetent to understand the proceedings against him. Lebron v. United States, 1955, 97 U.S.App.D.C. 133, 229 F.2d 16, cert. denied, 1956, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492. A court does not refer a defendant for psychiatric examination unless there is some evidence of a mental disorder at the time in question. See United States v. Leach, D.D.C.1964, 231 F.Supp. 544. The question of whether a defendant is mentally competent to stand trial is a factual issue to be resolved by the court. United States v. McFalls, E.D.Tenn.1965, 247 F.Supp. 439.

At the time sentence was imposed, the court was aware of several factors which reflected on Crawn's competence. No irregularities—and the record attests to none—in the proceedings before Judge Nealon were brought to this court's attention. No motion by the Government or Crawn was made before Judge Nealon or this court for a determination of Crawn's competence. Crawn had not been confined to a hospital since April 1961, or almost three years before sentence was imposed, even though during much of that time he had been in penal custody where any mental condition undoubtedly would have been observed. It was reasonable to infer from his discharge from the hospital, and the long

period of time during which it was not necessary to hospitalize him, that there had been a remission of his mental condition. Prior to sentence, the court queried Crawn on the charges and while his answers were mostly "yes" and "no," it was obvious that he was aware of the charges against him. He correctly estimated the amount of time he had been institutionalized and correctly stated his age. The reason he stated for the commission of the crime, while certainly not a mitigating factor, did not show any inconsistency or did not show that he was out of touch with reality, but demonstrated an understanding that he committed the offense. His demeanor suggested competence. Thus, if these matters known at the time of sentence were the only evidence of record now, as it was then, this court would find no need for psychiatric examination and would hold that at the time of his plea and sentence Crawn was competent to consult with his lawyer with a reasonable degree of rational understanding and to understand, rationally and factually, the proceedings against him; and that there was no "cause to believe that * * * [Crawn] * * * may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." 18 U.S.C.A. § 4244.

There are cases, however, which hold or suggest that when a pre-sentence report reveals "borderline insanity" or when the court is aware of the recent discharge of a defendant from a mental hospital, the court should conduct an inquiry into his competence to stand trial. See Hyatt v. United States, D.Colo.1963, 223 F.Supp. 594. It was on the basis of this and similar decisions that when Crawn filed his motion to vacate sentence, the court was prompted to cause Crawn to be examined and to grant a hearing on the question of his competence at the time of the plea and sentence. On the basis of the knowledge, as previously discussed, that this court had at the time of sentence, and on the basis of facts developed since the sen-

tence and at the hearing, this court is convinced that at the time of his plea and sentence Crawn met the standard of competence set forth in Dusky v. United States, supra, and 18 U.S.C.A. § 4244.

There were four letters, which were treated as motions for a reduction of sentence, received from Crawn within the two month period after he was sentenced and sent to Lewisburg. They showed no indication of incompetence. In the first letter dated March 2, 1964, and received March 6, 1964, or within two weeks of the sentence, Crawn detailed the facts of his imprisonment and hospital confinements in New Jersey. He indicated that his past record, on which he believed the court based the sentence, was misleading because much of his confinement was caused by what he termed "nervous breakdowns." The letter was well written, considering Crawn's background and training, and was accurate considering that he was relying on memory for dates and places of his confinements for a period of eight years. He also related a family history substantially in accord with much of that which the probation office learned in its preparation of the pre-sentence report. It showed his complete awareness of the offense charged, the day he was sentenced, and the place where he was sentenced. His plea for the reduction of sentence was grounded in facts that any competent person would present to invoke leniency. The three subsequent letters, dated March 14 and April 10 and 22, 1964, were similar and also added facts which were in accordance with reality. When his plea for leniency based on his past background was denied, he attempted to obtain a reduction of sentence to reflect the time he had spent in Lackawanna County jail prior to sentence. Subsequent letters correctly referred to those previously sent to the court.

The records introduced in evidence at the hearing show that shortly after he began to serve his sentence at Lewisburg, he underwent a classification study

and a physical examination. The classification study indicated that he responded well to supervision in the dormitory where he seemed to be "the follower-type, keeping mostly to himself." He requested cell quarters. He was assigned to orderly duties. He also underwent a physical examination during which he described his present health as "feels good." He correctly reported his history of nervous trouble, and excessive drinking habits. He was rated as qualified for regular duty. In June 1964, he requested an eye examination as a result of which he was issued glasses. He had no significant history of complaints, physical or mental, until December 22, 1964, when he complained that in placing a chair on top of a sewing machine so that he could sweep the floor, the chair hit the needle which broke off and flew into his eye. Initial examinations were negative, and an examination a few days later disclosed two small pieces of razor blade in his eye, and an infection. On January 8, 1965, an outside eye specialist found the eye was making good progress. The safety officer expressed the opinion that Crawn was a victim of bad advice as a result of which he had attempted to build a compensation case. Crawn then began to complain about inadequate medical attention. Because of his prior history of mental disorder and the fixation on the injury, he was placed on observation for schizophrenic reaction. It was after this episode that Crawn began the antics which culminated in his transfer to Springfield. Just prior to the transfer, a report by a psychologist at Lewisburg, approved by a psychiatrist, noted Crawn's past history of mental illness and described the antics related to his eye episode as "His most recent blow-up," and the residuals of a psychotic outburst. The reason for his transfer was:

> "This 25 year old white male has a medical problem and a psychiatric disorder that we feel needs evaluation at Springfield. He had an injury to his left eye on December 22, 1964, the circumstances of which are not altogether clear to us. At the time of injury no abnormality was apparent in the injured eye. On December 24, 1964 a foreign body was removed from the sclera of that eye and the patient was placed on local antibiotic therapy. This inmate has been seen by the opthalmologist on three separate occasions. The earlier laceration of the sclera has completely healed but the patient complains of limited vision in the eye of injury. He describes a central scotomata. We are unable to do the necessary studies to further evaluate this. In view of the fact that this case also has legal implications we feel that he should have a thorough opthalmologic examination and possible neurologic evaluation.

> "Regarding the emotional disorder, this patient has a long history of psychiatric problems which have necessitated his admission to several mental hospitals. He has been diagnosed as a schizophrenic reaction on several occasions. Since the recent difficulty with the eye he has decompensated and has been hospitalized on the psychiatric service. It is the feeling of our psychiatrist, Dr. Edward Kaufman, that this patient could benefit from evaluation and therapy at the Springfield Medical Center."

It was the eye episode, however, which was thought to be the cause of his "decompensating mentally as he had in his other incarcerations."

Shortly after his transfer to Springfield, he resided in the open ward for younger patients and worked in the clothing room. In a report of a neuropsychiatric examination, dated March 25, 1965, it was stated:

> "* * * There is no particular habit suggestive of a psychoneurosis or other nervous havit (sic).

> "His mood is only mildly depressed. There is no particular psychomotor retardation.

> "The mental content demonstrates no evidence at the present time of hallucinations or delusions. When asked

about his feeling about his eye he states that that is all past now since the doctors here has (sic) assured him strongly that his eye is going to be okay. There is no particular ideas (sic) of reference exhibited at the present time. The fund of knowledge is limited by his education and background but is consistent with that. He is oriented in all four spheres and his remote and recent memory is intact. \* \* \*

"DIAGNOSIS: 000–x42 Schizoid personality. The patient is currently functioning on this level of personality disorder, is in contact with reality and demonstrates only a small amount of residual of what could be termed in the past a psychotic decompensation to a full blown schizophrenic reaction paranoid type. It should be noted that this individual's decompensation is always following an incarceration and his ciminal actions and acting out behavior seem partly determined by the mental processes."

Upon learning that Crawn had been transferred to Springfield, the court contacted that institution to obtain a mental evaluation. In a letter dated July 1, 1965, as a preliminary reply to the court's inquiry, Dr. Harris, Warden and Chief Medical Officer, stated:

" \* \* \* You will note that the diagnosis both at the U. S. Penitentiary, Lewisburg and here at this institution has been schizoid personality. Such a diagnosis does not ordinarily raise any question of competence.

"We further note that he was committed to Lewisburg on February 22, 1964 and did not come to the attention of the medical staff there from a psychiatric standpoint until December 22, 1964, when he complained of an alleged eye injury. Incidentally he no longer has any eye symptoms and our specialist examination here reveals no evidence of an eye disease.

"In spite of the past history of mental illness, including previous psychotic diagnoses, it would be our opinion that the records and our examination do not support a contention that incompetence existed at the time of his trial."

Dr. Rothstein, a staff psychiatrist at Springfield, subsequently examined Crawn on July 27, 1965, and reported:

"He was asked what he thinks about his competency at the time of the trial. He said he thinks that he was not competent at the time. He feels that he wasn't completely insane but he was not aware of the seriousness of the crime or of other things at the time of the trial. He feels his lawyer did not help much. This was a court-appointed lawyer.

"He was asked if he thinks he is competent now and he said yes. He was asked what had caused the change and he said maybe it was the environment. He said he had had a rough time on the street with his mother and father."

On the same day Crawn was examined by the psychiatric staff. The staff concluded:

"The patient related in general to the Staff in an appropriate manner and there was no evidence of present acute psychotic thought processes. It was the opinion of the Psychiatric Staff that the patient is competent at present in the sense of understanding the charges against him and assisting counsel. The Staff was unable to form any opinion about the patient's competence at the time of the previous trial, or his mental condition at the time of the offense."

At the hearing on August 3, 1965, Dr. Rothstein testified that at the time of admission and at the time of the examination, Crawn's condition manifested a schizoid personality and character which caused him to withdraw from people and not form good relationships, but that he did not reach the level of a schizophrenic psychosis, a condition where a person withdraws from reality. Dr. Rothstein shed some light on the conclusion drawn by the staff. He stated that based on a review of the records and his examina-

tion of Crawn, he could not find anything to indicate that Crawn's condition was any different in 1963 and 1964 than it was during his stay at Springfield, although he could not form a definite conclusion that Crawn was not any different *solely because Dr. Rothstein and the staff at Springfield had not examined Crawn in 1963 and 1964.* He also testified that Crawn knew right from wrong and was able to understand the consequences of his acts.

At the hearing Crawn testified he recalled getting into the car and driving it and being arrested and that the offense took place in December 1963; he recalled making a statement to the F.B.I. although he claims that his brother made the first statement, a fact he also remembers, and this suggested the statement he gave to the F.B.I. He again testified accurately from memory to his past penal and hospital confinement, release dates, etc. His demeanor on the stand did not suggest incompetence. He testified that at the time of the hearing he was capable of deciding whether to plead guilty or defend, and that he did not believe he was in need of treatment for a mental condition. In response to the court's questions, Crawn testified to details of his movements prior to the commission of the offense on December 9, 1963. He remembered being in the courtroom on the day he was sentenced. The court then queried him on his answers at the time of sentence. While he could not recall some of the questions and answers, he admitted that the answers he had given were correct.

Thus far, Crawn's competence has been viewed from the standpoint of the information before the court from the time of the commission of the crime to sentence, and the evidence developed since the sentencing. The evidence dealing with Crawn's competence while incarcerated in New Jersey is much more removed than that developed since the crime because Crawn had not been hospitalized for a mental condition since April 1961, almost three years prior to the commission of the instant offense.

The New Jersey State Hospital records disclose that his last admission in May 1960 was deliberately staged so that he might spend his penal time in a hospital rather than the reformatory. Upon his discharge from the hospital in April 1961, Dr. Larsson stated:

"* * * The patient shows no overt symptoms of psychosis. It is therefore recommended that he be returned to Bordentown. During his stay here, he has received one course of electric shock treatments and tranquillizers. At present, he receives no treatments.

"DIAGNOSIS: Schizophrenic Reaction, Residual Type." The psychiatric staff noted:

"This patient has had five admissions to the hospital. He in the past has carried the diagnosis, Schizophrenic Reaction. When the record is examined very closely, it is very obvious the patient in the past has only been able to reside in Bordentown for a short period of time. He has had the benefit of considerable amount of treatment. He is on no medication at the present time. He is not hallucinated, has been socializing. The staff feels that he could return to Bordentown and would make the recommendation that it might be wise not to place this man in isolation, or quarrantine, because apparently this is a factor in the patient becoming upset. It is recommended that he return to Bordentown and we will assign him the diagnosis, Schizophrenic Reaction, Residual Type."

Thus, while at the hearing Dr. Rothstein characterized the New Jersey medical records as showing a condition more severe than that detected at Springfield, the medical staff at the New Jersey State Hospital apparently did not consider it severe at the time of his discharge. Moreover, Crawn's incarceration, and therefore opportunity for observation except for three days, continued for almost two years after his discharge from hospitalization, yet no psychiatric disturbance was noted. In a letter dated July 30, 1965, under which

the New Jersey State Hospital forwarded its records to the United States Attorney for purposes of the hearing in the instant motion, Dr. Goyne of that institution stated:

" * * * It is the opinion of the Medical Staff that at the time of his release from the hospital he showed no evidence of overt psychotic symptomatology and was competent and fully responsible."

■■ On the basis of all the evidence, this court finds that Crawn at the time of his plea and sentence met the standard of competence of Dusky v. United States, supra, despite his prior hospitalizations for mental disorders. Akers v. United States, 6 Cir. 1960, 280 F.2d 198. Since he was then competent, it is unnecessary to consider whether he was insane at the time that the crime was committed because being so competent, it is reasonable to assume that he would have raised the defense of insanity rather than plead guilty to the offense. Moreover, such function is reserved to the trier of fact in any trial where the defense of insanity is interposed. Hurt v. United States, 8 Cir. 1964, 327 F.2d 978. The petition indicates clearly that he limited the allegations therein to his competence at the time of trial.

■■ Having found that Crawn was competent, it would serve no useful purpose to grant Crawn's motion of September 20, 1965, and renewed by him on several occasions, that a defense psychiatrist be appointed. The petition was filed more than a month after the hearing; and there being nothing which would justify a reopening of the hearing, the request is belatedly made. A petition for appointment of a second psychiatrist is a matter within the court's discretion, and is properly denied in the absence of a showing that such examination would aid in the determination of a defendant's competence. Ruud v. United States, 9 Cir. 1965, 347 F.2d 321. In Royal v. United States, 10 Cir. 1960, 274 F.2d 846, 853, the court said:

"The final point sought to be made by the appellant is without merit. Whatever the interplay between the provisions of sections 4244 and 4246, and 4247 may be in other respects, it is clear that the requirement of the latter for appointment of a psychiatrist to be designated by the prisoner is only applicable in favor of one who already has been sentenced and whose sentence is about to expire; and that section 4244, under which Royal's hearing was properly held, contained no such mandatory provision either in terms or by reference. In support of this conclusion we barely resist citing the wag whom Mr. Justice Frankfurter quoted in Greenwood to indicate the desirability of recourse to the terms of the Act itself. The requested appointment was not mandatory. The lower court did not abuse its discretion in declining under the circumstances shown by the record to appoint an additional psychiatrist at the instance of the defendant."

The motion to vacate sentence and motion for appointment of a psychiatrist will be denied.