UNITED STATES of America

v.

Melvin W. COLLINS, Appellant.

No. 22550.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1969.

Decided Aug. 28, 1970.

Mr. Richard H. Mayfield, Washington, D.C. (appointed by this court) for appellant.

Mr. Harvey S. Price, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Messrs. David G. Bress, U. S. Atty., at the time the record was filed, and William S. Block, Asst. U. S. Atty., also entered appearances for appellee.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge.

The District Court, with a jury waived, found appellant guilty on seven counts of federal narcotics offenses. 26 U.S.C. §§ 4704(a), 4705(a); 21 U.S.C. § 174. The proof at trial was of sales of narcotics by appellant to a police undercover agent on two occasions, and the subsequent finding of narcotics in appellant's possession at the time of his arrest. Concurrent sentences were imposed on all counts. On this appeal, no issue is raised as to appellant's commission of the proscribed acts. What is urged is that (1) denial of a pretrial motion for a mental examination deprived appellant of an insanity defense, and (2) evidence adduced at a post-trial hearing of an objection to a St. Elizabeth report on a pre-sentence mental examination required the court to set aside its verdict and to find appellant not guilty by reason of insanity.

We are not persuaded by our reading of the record that disturbance of the convictions is warranted by either of these claims. We do find the sentencing proceedings so fraught with misunderstanding as to justify our vacating the present sentences and remanding for resentencing in which appellant may be considered for commitment under Title II of the Narcotic Addict Rehabilitation Act. 18 U.S.C. §§ 4251–4255.

I

Appellant's appointed counsel moved, in advance of trial, for a mental examination pursuant to 24 D.C.Code § 301. The grounds asserted in the written motion were that appellant had a long history of drug addiction; his involvement with the law was directly connected with his addiction; and counsel had had difficulty securing appellant's cooperation in preparing for trial. As counsel revealed in her motion, appellant was firmly opposed to the request. Indeed, a few days later he filed a *pro se* state-

ment with the court "that a mental examination would be both harmful and prejudicial to my defense;" and he asked that his counsel be removed and new counsel appointed.

At the hearing of the motion, the United States interposed no objection to it. In her oral presentation, counsel reported that appellant "has since been cooperative," but she continued to emphasize his addiction as bearing on his competency. The court was at some pains to make clear to appellant that his submitting to a mental examination would not irretrievably commit him to an insanity defense. But, upon questioning from the bench, appellant reasserted his belief that "I am capable of assisting in my defense as it is." The court interrogated appellant at length, probing his knowledge and understanding of the charges against him and his capacity and purpose to be of assistance in the preparation of his defense. The responses being of a positive and rational nature, the motion was denied.

At the trial, appellant reiterated his earlier request that his court appointed counsel be replaced. The request was denied.[1] Appellant then waived trial by jury. The following day, after appellant's testimony with respect to his history of narcotics use, counsel again renewed her motion for a mental examination.[2] Appellant remained silent and the motion was again denied.

The Government's proof at trial consisted of the testimony by police officers as to the purchases of narcotics made from appellant, and the finding of narcotics on him at the time of his arrest. Appellant was the only witness for the defense. He declared his inability to remember his whereabouts on the days when he was alleged to have made the sales. He admitted to having narcotics in his possession at the time of his ar-

rest. He asserted that he had been a user of narcotics since 1951, although he did not assert that this had impaired his mental processes. On cross-examination, he stated that he had supported himself on occasion by shoplifting, but he denied buying drugs for resale to other addicts. In response to a question from the court on this score, he said that "it has never been necessary for me to purchase drugs from other people, because I have always been fortunate enough to have sufficient funds to buy my own drugs."

The court pronounced a verdict of guilty. It stated, however, that it "will take it upon itself that before sentence whether this defendant wants to or not he will have some psychiatric examination." A few days later, the matter came on for hearing on the sentence to be imposed. Counsel represented to the court that she had filed a motion for commitment under Title II of the Narcotic Addict Rehabilitation Act. 18 U.S.C. §§ 4251–4255. Appellant objected to this motion on his behalf. After extended colloquy, in which the court explained to appellant that, as an offender with one prior narcotics conviction, he faced a mandatory minimum sentence of ten years on each count as the alternative to rehabilitative commitment under the Act, the court acceded to a request by appellant that he be not committed under the Act.

Appellant appeared, however, to be acting under the mistaken impression, apparently shared by the court, that such forms of sentencing precluded an appeal. Counsel stating that this was the first time she knew that appellant was opposed to her motion for rehabilitative treatment, renewed for the last time her motion for a mental examination. The court then ordered appellant to St. Elizabeths for a mental examina-

1. No question is raised on appeal with respect to this ruling or the competence of counsel generally.

2. This was the second renewal. At a pretrial hearing of a motion to suppress evidence, counsel had, without success, renewed the motion for the first time. The judges in each case were different but the representations made to each were essentially the same.

tion, and continued the sentencing proceeding.

In due course a report was received from St. Elizabeths. Its conclusions were stated as follows:

\* \* \* In our opinion Mr. Collins is without mental disease or defect and competent for trial by virtue of having a rational as well as a factual understanding of the proceedings against him and being able to consult with counsel with a reasonable degree of rational understanding.

The patient is without mental disorder under the existing laws in the District of Columbia; however, if his drug dependence were considered a mental disorder it would be our opinion that the drug dependence does affect his mental and emotional processes and does substantially impair his behavioral controls. However, we would have no opinion as to whether his drug dependence caused the crimes of February 6 or 16, or March 2, 1967, if in fact he committed them.

There was an objection to the report and a hearing was held at which the issues of insanity and competency were explored with a St. Elizabeths staff psychiatrist, Dr. Daniel Pugh, called by appellant as a witness. In response to a question from the Government, Dr. Pugh, explained in these terms the genesis of the unusual language contained in the report:

Well, this is an unusual paragraph to be included in such an evaluation or letter and the reason for it was that we were informed by the patient's lawyers and by the patient himself that he was planning to be a test case in the Court of Appeals to examine the specific question of whether drug dependency should be considered a mental disorder or not.

Further questioning revealed Dr. Pugh's opinion that appellant was fully competent to stand trial and that appellant was not afflicted with any mental illness independent of his drug dependency.

The court, referring to the ambiguous nature of the St. Elizabeths report, stated that "the main purpose of having Dr. Pugh here is the opinion, the reason that he has for the mental condition on the crucial date in question and causal relationship to the crime committed." Defense counsel's direct examination proceeded as follows:

Q Doctor Pugh, not concerning yourself with any law, Court opinion, or legal meaning, is it your opinion that drug addiction affects an addict's mental processes?

A Yes it does.

The effect of mental process largely concerns the state of alertness when under the effect of heroin. An addict is likely to be left drowsy.

Q Any other way it would affect his mental processes, reasoning ability?

A No.

Q It would not affect his reasoning ability?

A No. Unless he was too sleepy to think.

Q In other words, you are saying that at the time a person is under the influence of narcotic it does not affect their reasoning ability?

A That is correct. It affects their degree of alertness. It makes them drowsy.

Q Well, is it your opinion that addiction affects the addict's emotional processes?

A Yes, it is. When an addict is under the influence of heroin he is likely to be inappropriately cheerful and euphoric. When he is in withdrawal he is likely to be inappropriately depressed and despondent.

Q. Well, is it your opinion that it can substantially impair the addict's behavior controls?

A I think that there is objective evidence of impaired behavior controls in narcotics addicts.

Specifically with regards to the question of whether they will use narcotics or not and what they will do in order to keep using narcotics, that is, I think most of us would feel that the judgment of narcotics addicts, particularly in regard to these questions is not as good as the judgment of non-addicts.

On the issues of productivity and responsibility as subjectively related to appellant, although the report stated that St. Elizabeths "would have no opinion as to whether [appellant's] drug dependence caused the crimes" of which appellant had been convicted, under questioning by the court Dr. Pugh admitted that he did in fact have an opinion but that he "thought that it would be best not to have our testimony obscured by a statement in the letter. * * *" This opinion as given, however, was that it was his "private opinion that drug dependency is a psychiatric illness and that Mr. Collins is mentally ill." No evidence in terms of productivity or responsibility in this case was ever forthcoming from the witness. The hearing continued with further reiterations of Dr. Pugh's personal belief that addiction is a mental illness and his "understanding" that such was not the law in the District of Columbia.

At the conclusion of the hearing, appellant's counsel moved for a new trial and for an independent psychiatric examination. Both motions were denied. The matter of sentencing was then taken up. Counsel asserted that she had explained to appellant that sentencing under Title II of the Rehabilitation Act did not prejudice his appeal rights, but he was still apparently seized of this misconception. Appellant then addressed the court, and stated that the reason he had opposed Title II commitment at the earlier sentencing hearing was because he thought his right to appeal his conviction would be lost. The court did not comment upon this statement, but turned to questioning appellant as to whether he was an addict.

After getting affirmative answers, the court said, "And you don't care to go to any institution for rehabilitation?" In response, appellant mentioned the voluntary program at St. Elizabeths. The court indicated that this "open ward" program was not legally available, and proceeded to impose sentence. The following then occurred:

The Court: * * * In other words, you are to serve ten years. * * * So the court is bowing to your request you not be sent under Title 2.

The Defendant: Your Honor, I would I guess explain, if I could appeal my case why I would be willing to accept it.

The Court: You have very competent counsel, and the counsel has advised you of your rights in this particular case.

But, if you want this a test case, you have that privilege. So it's ten years on the indictment.

## II

We turn first to the alleged impropriety of the denial of the pretrial motion for a mental examination. We are far from being able to say that the District Court abused its discretion in denying this motion. It was actively opposed by appellant himself, not only in court but by a letter filed by him with the court—a document which appears on its face to be the work of a wholly rational human being. That letter recited appellant's belief that a mental examination would be prejudicial to his defense, a view which he had expressed to his counsel. The latter was described as determined to go ahead with the motion despite her client's opposition. The letter went on to say that appellant had discussed with his counsel the defense of his case on the merits, and had urged her, without success, to seek discovery of some of the preliminary proceedings, including the minutes of the grand jury. Because of her lack

of interest in these matters, appellant asked that she be replaced.[3]

■ At the hearing, counsel urged in support of her motion that appellant was an addict who had used about 24 capsules a day. She also made a brief reference to early difficulties in cooperative formulation of a defense, but stated that more recently appellant "has since been cooperative." She emphasized that her primary and immediate concern was appellant's competency to stand trial. Appellant was then interrogated at length by the court with questions designed to elicit the degree of his understanding of his legal circumstances, as well as his position on the motion. His responses to the former were clear, including a statement that his daily usage was not as large as counsel had said it was, and his opposition to the commitment was steadfast. We cannot assert that the denial of the motion on this record was error. We do not understand the law to be that evidence of addiction alone invariably requires a commitment under 24 D.C.Code § 301. The court here made a careful and detailed inquiry before ruling upon counsel's motion, and the responses to that inquiry are not such as to make the ruling an abuse of discretion.

Although no issue is raised on this appeal with respect to appellant's competency to stand trial, we think it worth noting in this context that the St. Elizabeths report was unequivocal in its finding that appellant was "competent for trial by virtue of having a rational as well as a factual understanding of the proceedings against him and being able to consult with counsel with a reasonable degree of understanding." This conclusion, drawn from observation of appellant while he was at the hospital, was one which the court was entitled to draw from the happenings at the hearing of the pretrial motion. Dr. Pugh's later testimony was to the same effect, as the colloquy set forth in the margin shows.[4] We do not, accordingly, agree that appellant was deprived of an insanity defense at trial by an erroneous pretrial ruling.[5]

### III

■ It is not argued that the court's initial verdict of guilty was inadequately supported by the evidence before it. Rather, it is said that the evidence of insanity adduced at the post-trial hearing of the objection to the St. Elizabeths report was such as to require the court to set aside the verdict theretofore rendered by it and to acquit appellant by

3. Counsel subsequently filed a motion for a preliminary hearing and for production of grand jury minutes, and a motion to suppress evidence and to dismiss counts 1 and 2 of the indictment on the ground of an illegal search pursuant to an illegal arrest. Appellant had earlier filed written *pro se* motions generally of the same nature. Counts 1 and 2 were dismissed by the District Court before trial. From the time of his arrest and through trial, appellant was at liberty on monetary bond.

4. Q. Let me ask you this:
First of all, as of the time you examined him, what can you inform the Court as to his competency? Did he understand? Would he be able to cooperate with counsel and assist counsel? Is there any question in your mind about that?
A. No, there is no question in my mind that he was able to.
Q. Was there any question in your mind that he was able to understand the

charges that had been placed against him?
A. No, I think he had a good understanding of his charges.
Q. Is there any question in your mind that he would be able to understand the charges and cooperate with counsel in a sentencing proceeding when it came time for the judge, if he had been convicted, to impose sentence upon him, would he understand what was going on?
A. Yes.
Q. And be able to assist his counsel in his behalf?
A. Yes, he would.

5. Because this case was tried by the court without a jury, it could be said that, for all practical purposes, appellant was given the chance to defend on the grounds of insanity when the court delayed sentencing until after appellant had been examined at St. Elizabeths and an evidentiary hearing was held at the time of the motion for a new trial.

reason of insanity. We find no such compulsion in the record since, even if it be assumed that appellant was mentally ill, the record is devoid of any evidence that the crimes for which he was convicted are the product of that illness.

The St. Elizabeths report, it will be recalled, expressed no opinion on productivity. Although Dr. Pugh, as the anonymous author of that report, testified that he did have such an opinion, he stated that opinion as being his "private" view that "drug dependency is a psychiatric illness and that Mr. Collins is mentally ill." Although the court repeatedly referred to the ambiguous nature of the hospital report on the issue of causality, and pressed Dr. Pugh on that question, nothing was forthcoming except Dr. Pugh's reiteration of his personal belief that narcotics addiction constituted a mental illness. Defense counsel made no effort to elicit a direct response by Dr. Pugh to the productivity issue; and, indeed, the Government's cross-examination evoked the interesting observation from Dr. Pugh that he did not think appellant would have made the sales if he had known that his customer was an undercover policeman.

There was, thus, testimony only to the effect that drug addiction should in legal contemplation be taken to be a mental disease. Assuming that premise for the limited purpose at hand, there remains a deficiency of evidence in terms of the requirements of the insanity defense in this jurisdiction.[6] That deficiency alone precludes our implementation of the point now urged upon us by appellant as invalidating his conviction.

It would appear that the defense and Dr. Pugh were greatly preoccupied with establishing the proposition that narcotics addiction is a mental illness. Dr. Pugh, although new at St. Elizabeths and claiming only three months of experience in the narcotics field, was interested in securing a change in what he understood the law to be in this jurisdiction. He testified that he had discussed this matter with appellant's counsel before the report was written, and that both recognized that appellant would be a good test case because he clearly had no mental problems apart from addiction. Dr. Pugh said that he personally drafted the report, and was able to persuade the Acting Assistant Superintendent to sign it, despite its unusual language. There was no staff conference in appellant's case, contrary to the usual practice.

█ It may just possibly be that so-called "test cases" are not always the most effective instrumentalities from the standpoint of the client, in that the intensive focus upon one aspect of the defense may cause the neglect of others. Or it may be that the question of causality was avoided because any testimony about it would have been unimpressive. In any event, the central purpose of the insanity defense, which is to save from criminal conviction one who lacks responsibility for his unlawful acts, has not been achieved on this record by the introduction of sufficient evidence to make that defense a substantial issue in the determination of appellant's guilt or innocence.

---

6. As we said in Gaskins v. United States, 133 U.S.App.D.C. 288, 410 F.2d 987, " * * * With us, 'an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect,' (citing Durham v. United States, 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 874–75 (1954)), a standard thus combining a quality of mind and its linkage with the offending conduct. Exculpation entails an 'abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls,' (citing McDonald v. United States, 114 U.S.App. D.C. 120, 124, 312 F.2d 847, 851 (en banc 1962)), and which 'made the effective or decisive difference between doing and not doing the act.' (citing Carter v. United States, 102 U.S.App. D.C. 227, 236, 252 F.2d 608, 617 (1957)).

## IV

In advance of sentencing, counsel for appellant filed a written motion alleging that he was eligible for rehabilitative treatment under Title II of the Narcotic Addict Rehabilitation Act, and asking that he be committed to the custody of the Attorney General for examination and recommendation. At the initial sentencing hearing, appellant unaccountably objected to this disposition, although the court carefully explained to him the formidable alternative he was facing in terms of mandatory prison terms. The record indicates, however, that appellant was acting upon the erroneous assumption that he would forfeit the right to appeal his conviction; and the record also shows that he was not disabused of this notion at that time.[7]

When the matter of sentencing was taken up again at the later hearing, appellant's counsel said that she had explained to him that commitment under Title II would not bar an appeal, but that he still clung to that view. She asked that he be permitted to address the court directly. Appellant then told the court that, as he put it:

"Your Honor, I was of the opinion that being sentenced under the Act would deprive me of my rights to appeal. That was my reason for asking that the motion be withdrawn at the time I appeared in Court."

The court did not respond directly to this, but started asking appellant questions about his addiction. The colloquy ended as described above at p. 555.

Although we think the court had some reason for being confused by appellant's ambivalence in the matter of Title II, it did eventually appear quite clearly that appellant had been acting on a mistaken legal assumption which he was ready to abandon. The court seems not to have understood this, and we think the interests of justice will best be served by our vacating the sentences imposed upon appellant, and remanding for resentencing, at which time the possibility of a Title II commitment can be considered free of the confusion which has characterized it heretofore.

The convictions appealed from are, accordingly, affirmed, but the sentences are vacated and the case remanded for resentencing.

It is so ordered.

BAZELON, Chief Judge (concurring and dissenting):

If appellant was properly found guilty of selling narcotics, then I agree that he should have the opportunity to be sentenced under the treatment provisions of the Narcotic Addict Rehabilitation Act. I also agree that the evidence on the issue of responsibility was not such as to require an acquittal by reason of insanity. But the inquiry into appellant's responsibility for his unlawful acts was permeated by so much confusion that I would remand for a new trial on that issue.

## I

If the majority's disposition results in providing appellant with treatment under NARA rather than punishment in the form of a prison sentence, then it might seem unimportant to determine whether his conviction was properly rooted in a finding of criminal responsibility. Whether or not he was responsible for his unlawful acts he will be treated for his addiction. But in my view it is important to distinguish between those people who may fairly be blamed and held responsible for their unlawful conduct, and those who may not, because they could hardly have be-

---

7. THE COURT: And you want to be sentenced under the Statute, that is, not under the rehabilitation Statute.

THE DEFENDANT: Well, if this rehabilitation act would in any way affect my appeal I would like to have the motion withdrawn.

THE COURT: The Court recalls the case and you want to be sentenced so that you can take the case up on appeal, is that correct?

haved otherwise. The distinction is important even if the same therapeutic approach is appropriate for both the "sick" and the "bad." For as long as our system for dealing with antisocial conduct allocates blame to persons convicted of unlawful acts, justice demands that we pay close attention to the task of exempting from blame those persons whose capacity to conform their behavior to social norms is substantially impaired. The ideals of treatment and rehabilitation cannot justify the abandonment of the inquiry into blameworthiness, hairsplitting though that inquiry may seem at times, unless we are ready to abandon the concepts of guilt and blameworthiness altogether, as many would urge.[1]

There is of course a further reason for insisting on the inquiry. The convicted addict may be subject to treatment of substantially different kind and duration from the acquitted addict, and the substantive and procedural rights of the two may be quite different.[2] Therefore I cannot ignore the confusion in this record on the critical issue of criminal responsibility.

## II

At trial appellant's counsel attempted to raise the issue of responsibility, but because her motion for a psychiatric examination was repeatedly denied, the only evidence on which she could base an argument was appellant's own testimony establishing the fact that he had a heavy heroin habit. The prosecuting attorney asserted that appellant had not effectively raised the insanity defense at trial, and the view of the trial judge is unclear.

But whether or not appellant's testimony raised the issue of responsibility at trial, it was clearly raised by the psychiatric evidence introduced at the post-trial sentencing hearing. At that point the court finally granted appellant's motion for a psychiatric examination, and the doctor who performed that examination at St. Elizabeths Hospital presented the only expert psychiatric testimony in the case. Dr. Pugh testified that appellant was addicted to heroin, and that his addiction impaired his mental and emotional processes and behavioral controls in certain specified ways. He explained that heroin addiction can produce drowsiness, inappropriate cheerfulness, and euphoria; withdrawal symptoms including extreme depression; and impaired judgment with regard to the questions whether to continue using narcotics and how to obtain them. No other relevant testimony was elicited from Dr. Pugh by either the appellant or the government.[3] While the

---

1. See, e. g., B. Wootton, Crime and the Criminal Law (1963); K. Menninger, The Crime of Punishment (1968).

2. E. g., the convicted addict may be confined under Title II of NARA for a period of up to ten years or the maximum sentence that could have been imposed, whichever is shorter. 18 U.S.C. § 4253(a) (Supp. V, 1969). An addict acquitted for lack of criminal responsibility, on the other hand, may be confined so long as he remains mentally ill and dangerous to himself or others, a period which may be longer or shorter than the maximum confinement above. D.C.Code § 24–301(e) (1967); Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968). Compare the 36-month maximum for civil commitment of addicts under Title I of NARA, 28 U.S.C. § 2903(c) (Supp. V, 1969), and the 42-month maximum under Title III, 42 U.S.C. §§ 3416, 3417 (Supp. V, 1969).

3. Considerable time was spent exploring the question whether narcotics addiction is a mental illness. Dr. Pugh's professional opinion was that addiction is an illness, but he expressed doubt that such an opinion was acceptable as a matter of law. The trial judge never resolved that doubt, pursuing instead a line of questioning designed to ascertain whether addiction is regarded as a mental illness by the psychiatric profession or by St. Elizabeths Hospital. But of course appellant's responsibility for the acts charged depends on neither the legal nor the psychiatric answer to the question whether addiction per se may be a mental illness. For the purpose of the insanity defense, a mental illness is "any abnormal condition of the mind that

evidence on the issue of responsibility was thus regrettably sparse, it clearly amounted to "some evidence" sufficient to impose on the government the burden of proving responsibility beyond a reasonable doubt.[4] The rule requiring the defendant to come forward with "some evidence" of nonresponsibility is designed to avoid putting the government and the defendant to the expense and inconvenience of psychiatric examinations and extended testimony on the subject unless the defendant intends to contest the issue.[5] For this purpose, the defendant need only introduce enough evidence to give notice of a nonfrivolous claim; he need not introduce evidence sufficient to establish the validity of that claim.

When the presentence examination revealed some evidence of nonresponsibility, the trial court was obliged either to grant appellant's motion for a new trial, at which both parties would have the opportunity to explore the issue in the detailed fashion it normally requires, or at least to re-evaluate the verdict in light of the newly available evidence. It may be that the trial court did in fact reconsider its verdict, and concluded that the government had met its burden of proving responsibility beyond a reasonable doubt.[6] The same expert testimony that raised the issue would support such a finding of responsibility. The court could reasonably have concluded that the impairment described by Dr. Pugh was not substantial enough to relieve appellant from responsibility for his unlawful acts.

I am troubled, however, by the possibility that the trial judge and the litigants were under the erroneous impres-

---

substantially affects mental or emotional processes and substantially impairs behavior controls." McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (en banc).

The label attached to narcotics addiction by Dr. Pugh, or by the Hospital, can neither create nor destroy a defense on the ground of nonresponsibility. The role of the psychiatric expert is not to tell the court which abnormal conditions constitute exculpatory illnesses and which do not, but rather to tell the court as much as possible about the extent to which an abnormal condition may impair an individual's mental or emotional processes and behavior controls. The record in another case recently before this court indicates that Dr. Pugh has recently changed his professional evaluation of addiction, concluding that it is not after all a mental disease. See Memorandum of Appellee, Williams v. Robinson, 139 U.S.App.D.C. ——, 432 F.2d 637 (decided June 19, 1970). But that of course is no more significant than his earlier insistence that addiction is a disease. It is uniquely for the factfinder, as repository of community values, to determine whether the impairment described by the experts in the science of human behavior is sufficient to relieve a defendant of responsibility for his unlawful acts.

4. See Adams v. United States, 134 U.S. App.D.C. 137, 141, 413 F.2d 411, 415 (1969) ; McDonald v. United States, 114 U.S.App.D.C. 120, 122, 312 F.2d 847, 849 (1962) (en banc) ; Tatum v. United States, 88 U.S.App.D.C. 386, 389–391, 190 F.2d 612, 615–617 (1951). Of course the character and extent of the defendant's evidence determines the lengths to which the government must go to prove responsibility beyond a reasonable doubt. In some circumstances, the government can meet its burden simply by relying on the weakness of the defense evidence. King v. United States, 125 U.S.App.D.C. 318, 322–324, 372 F.2d 383, 387–389 (1967) ; Hawkins v. United States, 114 U.S.App.D.C. 44, 47, 310 F.2d 849, 852 (1962). On this point, however, a distinction should be made. If the defense evidence is weak because the impairment described by the experts is of a minimal nature, then the prosecution can meet its burden by persuading the jury that the impairment was not substantial enough to constitute an exculpatory mental disability. If, on the other hand, the defense experts describe an impairment so serious that it is clearly exculpatory, and the weakness lies in the fact that they are not persuasive, the prosecution can meet its burden only with contrary expert evidence.

5. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 357, 40 L.Ed. 499 (1895).

6. See majority opinion, supra, at note 5.

sion that the issue had never been raised, and hence that the government was not required to prove responsibility beyond a reasonable doubt. Because there was no jury, and no instructions were necessary, it is difficult to ascertain whether the trial court considered and rejected the claim of nonresponsibility, or simply regarded the issue as absent from the case.[7] If the post-trial psychiatric report persuaded the trial judge to reevaluate his verdict, he should have made that view of the case explicit, giving both the prosecutor and the defendant the opportunity to adduce additional evidence for a fuller exploration of the issue. The defendant might have been able to elicit further testimo-

ny from Dr. Pugh, or from an independent psychiatrist.[8] The prosecutor surely would have introduced evidence of appellant's responsibility, and argued the point, rather than relying on the possibility that the trial court would find beyond a reasonable doubt that defendant's uncontroverted impairment was not sufficiently substantial to relieve him of responsibility for his acts.

There are some indications in the record that the trial judge considered the issue and resolved it adversely to defendant.[9] But without a firm basis for concluding that the trial court found responsibility beyond a reasonable doubt, I would remand for a new trial on this issue.

7. This problem would not exist if the trial court had followed the factfinding procedure we recently commended in United States v. Carter, U.S.App.D.C. (No. 22,912, decided June 5, 1970) (slip opinion at 13–14 n.8) (Bazelon, C. J., concurring).

8. If the trial judge considered the issue of responsibility to be in the case, it is hard to understand why he denied appellant's motion for an independent psychiatric examination after receiving the ambiguous report and testimony of Dr. Pugh.

It appears that Dr. Pugh himself had formed some opinions on the relationship between appellant's addiction and the unlawful acts, but he never expressed them because he thought that first he had to establish that appellant was suffering from a legally recognized illness. He stated that his written report contained no statement on that matter because he preferred to wait until he could find out "exactly what the Court wished to know." Apparently he never found out.

9. Near the beginning of the post-trial hearing, the court stated that "the main purpose of having Dr. Pugh here is the opinion, the reason that he has for the mental condition on the crucial date in question and causal relationship to the crime committed."