UNITED STATES of America

v.

Napoleon B. LECHOCO, Appellant.

No. 75–1831.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1976.

Decided Sept. 23, 1976.

Jacob A. Stein, (appointed by this court) and Joseph Borkin, Washington, D.C., for appellant.

Peter E. George, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and William H. Collins, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Mary-Elizabeth Medaglia, and James F. McMullin, Asst. U.S. Attys., Washington, D.C., at the time the record was filed, also entered appearances for appellee.

Before MacKINNON and WILKEY, Circuit Judges, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by MERHIGE, District Judge.

MERHIGE, District Judge:

Appellant, hereinafter referred to as Lechoco, convicted of kidnapping and other offenses arising from his holding of the Philippine Ambassador to the United States as a hostage on November 18, 1974, appeals.

A brief recitation of the factual background is relevant to an understanding of the issues before the Court. Lechoco, a native and a practicing lawyer of the Philippines, immigrated to the United States with his wife in 1972, followed in 1974, by six of their seven children. Their eldest child, a boy of seventeen, did not accompany his brothers and sisters but remained in the Philippines.

Lechoco, on November 18, 1974, under the impression that his son was being held as a political hostage, gained entrance to the office of the Philippine Ambassador by a ruse and at gunpoint demanded that his son be brought immediately to this country.

During a series of events which followed his entrance to the Ambassador's office, a member of the ambassadorial staff was shot, the Ambassador handcuffed and held hostage for a period of over eight hours while Lechoco engaged in telephonic conversations with various people in reference to his demands of the delivery of his son to this country. Amongst the people with whom Lechoco engaged in such conversations were his attorney; which conversations were taped by law enforcement officers. After being assured that his son would be brought to Washington, D.C., Lechoco released the Ambassador, surrendered to the police and was taken to St. Elizabeth's Hospital for mental observation. He was subsequently declared competent to stand trial which commenced as to the guilt phase in December of 1974 at which time he offered no evidence and was found guilty by a jury. This was followed by a jury trial as to his competence at the time of the alleged offense at which trial the defendant presented evidence. It was during this aspect of his trial of which he complains contending error in the admission and rejection of evidence. He assigns error on the basis of two rulings by the trial court.

■ First, the defendant attacks the admission into evidence of tape recordings of conversations between himself and his attorney which took place during the incident at the Philippine Embassy. The record reflects that the defendant was not only aware that these conversations were being recorded, but they took place in the presence of the captive Ambassador. Under these circumstances, the defendant's claim of attorney-client privilege is meritless. *See United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir. 1975); *United States v. Simpson*, 154 U.S.App.D.C. 350, 475 F.2d 934, 936 (1973); *Cafritz v. Koslow*, 83 U.S. App.D.C. 212, 167 F.2d 749, 751 (1948). Appellant's position simply stated is that under the existing circumstances, he was unable to speak in privacy with his attorney and hence the rule requiring privacy in

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

order to enforce the attorney-client privilege should not be applied. Just as simply stated, the lack of privacy was a matter which was entirely within the control of Lechoco under the circumstances existing.

Of more substance is Lechoco's contention that the trial court's exclusion of evidence pertaining to his reputation for truthfulness and honesty was error. For the reasons which follow we are in accord.

■ During the insanity phase of the trial, the defendant called as witnesses three psychiatrists in support of his position. Dr. Edward Rickman testified in detail as to the defendant's personal history and the sequence of events leading to the kidnapping of the Ambassador. Based on his interview with the defendant, the doctor concluded that Mr. Lechoco at the time of the offense was suffering from a personality disorder which he labeled as gross stress reaction. According to the doctor, this stress was rooted in the defendant's attempt to secure the release of his eldest son from what he perceived to be political captivity in the Philippines.[1] Gross stress reaction was classified by Dr. Rickman as a mental disease exhibited by an inflexible behavior pattern. His conclusion was that on the day of the offense, Mr. Lechoco may have been able to distinguish right from wrong, but was unable to control his actions. A second psychiatrist concurred with Dr. Rickman's opinion that the defendant was afflicted by a mental disease at the time of the offense. This witness, Dr. Kleinerman, described the condition as "an acute transient psychosis occurring during a period of extreme stress." The doctor's testimony was to the effect that the condition was comparable to "battle exhaustion." The third of the defense psychiatrists, Dr. Ernest Y. Williams, concluded that at the time of the offense the defendant was suffering from "a psychotic depression which went over a period of years and which culminated in an obsessive, compulsive reaction . . . ." On cross-examination, Dr. Williams stated that the defendant was "irresistibly impelled" to commit the acts which constituted the elements of the offense as charged.

The testimony of these doctors, if accepted by the jury, would have provided an adequate basis for a verdict of not guilty by reason of insanity. Taken as a whole, their testimony strongly suggests that the defendant did not have substantial capacity to conform his behavior to the requirements of law. *United States v. Taylor*, 167 U.S.App. D.C. 62, 510 F.2d 1283, 1290, *rehearing en banc denied*, 170 U.S.App.D.C. 315, 516 F.2d 1243 (1975); *United States v. Robertson*, 165 U.S.App.D.C. 325, 507 F.2d 1148 (1974); *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969, 990 (1972) (en banc). As the defendant's sanity was the only unresolved issue during this phase of the trial, the jurors' determination of the weight to be given to the defense psychiatrist's opinions rested to a great extent on the reliability of the information underlying their respective opinions. The defendant's credibility, therefore, was of crucial importance.

Understandably, the prosecuting attorney undertook a vigorous cross-examination of each of the doctors. In attempting to discredit their testimony, counsel for the government raised issues pertaining to Lechoco's truthfulness. In each instance, the cross-examination followed a similar pattern. First, the doctors would testify that their diagnoses were based in substantial part on the psychiatric interviews that each conducted with the defendant.[2]

---

1. Mr. and Mrs. Lechoco entered the United States on tourist visas in 1972 in order to flee alleged political harassment in their native Philippines. In 1974, he was able to secure a permanent visa thereby enabling six of his seven children to immigrate to this country. Lechoco perceived his remaining son to be a political prisoner. Dr. Rickman also considered the defendant's childhood and the significance attached to the eldest son in the Philippine culture as contributing to his mental condition on the day of the incident.

2. Dr. Rickman was asked:
   Q. ". . . and the only basis that you have for your opinion is what he [the defendant] told you, this man who wants to be acquitted in this case, is that right?
   A. That's correct."

Additionally, the doctors conceded that their opinions might be different if Lechoco had been untruthful to them.[3] The attack culminated in a series of questions which either inferentially or directly suggested that Lechoco had, in fact, deceived his doctors.[4] Illustrative of the government's counsel's technique is the following interrogation of one of the doctors.

"Q. . . . and the only basis you have for your opinion is what he [the defendant] told you, this man who wants to be acquitted in this case, is that right?

A. That's correct.

Q. I assume that you concede that he certainly has a very strong motive to lie to you. Don't you concede that?

*      *      *      *      *      *

Q. And if what he was telling you was false, this would have to affect your diagnosis, wouldn't it?

Dr. Kleinerman was asked:

Q. ". . . there is nothing in this man's past life except what he is telling you to indicate mental illness, is there?

A. That is correct."

Dr. Williams was asked:

Q. "Are you telling us that you relied on what this man told you? I take it from what you have just said on direct examination that you do rely and put credence on what this man [the defendant] told you?

A. I do."

3. Dr. Rickman was asked:

Q. "And if what he was telling you was false, this would have to affect your diagnosis, wouldn't it?

A. Yes."

Dr. Williams further testified "I don't know anything about him and if I don't take his word as to what he is telling me, I have no history . . . ."

4. Questions to Dr. Rickman:

Q. "I assume you concede that he certainly has a very strong motive to lie to you. Don't you concede that?

*      *      *      *      *

. . . Would not a person in his situation charged with major offenses wanting to be acquitted by reason of insanity have a very good reason to try to fool or con you into a mental illness diagnosis?

*      *      *      *      *      *

Q. You don't really know whether the son did call or not, do you?"

Dr. Kleinerman was asked:

A. Certainly . . . ."

At the conclusion of the doctor's testimony, a fellow worker of Lechoco's was called to the stand. The defense sought to elicit testimony relating to the defendant's reputation for truthfulness and honesty. The prosecution's objection on the grounds of relevancy was, we conclude, erroneously sustained.

The settled law in this circuit is that

"[T]he accused may elect to advance one or more of his character traits as evidence of his innocence. If he does, his proof is confined to evidence of his reputation in the community for those traits. His presentation, in terms of number of such traits, may be as narrow or as broad as he chooses so long as it remains germane to issues on trial."

*United States v. Lewis*, 157 U.S.App.D.C. 43, 482 F.2d 632, 637 (1973) (footnotes omit-

Q. "Well you don't know whether the son wanted to come, do you? . . . All you have is his word that the son couldn't come, right?

*      *      *      *      *      *

Q. . . . Didn't he tell you that he bought a gun on October 23? He did nothing that day.

A. He bought the gun, he told me, because somebody broke into his house and he wanted this for protection.

Q. Well, now you didn't verify whether or not anybody had broken into his house, did you?

A. But that is what he told me.

Q. Yes, but he didn't produce any policy reports or anything, did he?

Q. And are you telling us that you can believe what he told you?"

The examination of Dr. Williams contained the following colloquy:

A. ". . . He did not tell me he bought it for the Ambassador's purpose.

Q. Right. Of course, that's what he said but that's not necessarily so, is it?

A. Well it's not necessarily so what you think either.

Q. Because he didn't tell you the truth in a lot of other areas, did he?

*      *      *      *      *      *

Q. Doctor, if a man gives you a history and if the man is lying to you, are you telling us that your diagnosis is a correct diagnosis?"

ted). *See also Michelson v. United States*, 335 U.S. 469, 477–78, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Fox*, 154 U.S. App.D.C. 1, 473 F.2d 131, 134–35 (1972).[5] The government's position is that evidence of the defendant's reputation for truthfulness is germane only when the defendant himself has testified or when that particular trait is involved in the offense charged. Admittedly, there is support for this position. *See, e. g., United States v. Bishton*, 150 U.S.App.D.C. 51, 463 F.2d 887, 893 (1972); *Awkard v. United States*, 122 U.S. App.D.C. 165, 352 F.2d 641, 642 n. 1 (1965); *Morris v. District of Columbia*, 75 U.S.App. D.C. 82, 124 F.2d 284 (1941). *See generally*, 1 Wigmore Evidence §§ 55–58 (3d ed. 1940); *McCormick*, Evidence § 191 (2d ed. 1972). There are, however, other instances in which a defendant's truthfulness is particularly pertinent. As stated by the Chief Justice, then a member of this Court,

"[T]hus a Defendant may try, whether or not he takes the stand, to cast doubt on the probability of guilt by showing that some in his community believe him to be truthful and honest."

*Shimon v. United States*, 122 U.S.App.D.C. 152, 352 F.2d 449, 453 (1965). We deal here with a situation wherein the defendant's truthfulness, in light of the expert opinions which were bottomed on an acceptance by each of them of his recitation, has a direct bearing on his guilt or innocence notwithstanding his failure to testify and that the crimes with which he was then charged do not involve that particular trait.

Criminal responsibility is generally assessed only when through "free will" a man elects to do evil. "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). The defense of insanity is largely a by-product of this philosophy.

"An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. Action within the definition is not enough. To be guilty of the crime a person must engage responsibly in the action. Thus, an insane person who does the act is not guilty of the crime."

*Easter v. District of Columbia*, 124 U.S.App. D.C. 33, 361 F.2d 50, 52 (1966) (en banc). *See also United States v. Taylor*, 167 U.S. App.D.C. 62, 510 F.2d 1283, 1290–91 (1975); *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc); *United States v. Collins*, 139 U.S.App.D.C. 392, 433 F.2d 550, 556 (1970).

■ The testimony of each of the defense doctors supports Lechoco's theory that he was not responsible for the acts committed on November 18, 1974. As already referred to, the testimony of each of the doctors was bottomed on the truthfulness of Lechoco's statements given during psychiatric interviews. Hence, his veracity goes to the heart of his guilt or innocence and the Government in their cross-examination of his witnesses raised the issue of his credibility and thus opened the door for the introduction of testimony as to his reputation for truth and veracity. Under these circumstances, it was error to exclude the proffered evidence.

■■ The Court, moreover, is unable to conclude that this error was harmless beyond a reasonable doubt. The extent to

---

**5.** Rule 404(a) of the Federal Rules of Evidence provides in part:

(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

While this rule was not in effect at the time of trial, its application would not alter the result. Rule 404(a)(1) merely codified the then prevailing practice. See Federal Rules of Evidence, Advisory Committee's Note, Rule 404(a)(1); Weinstein & Berger, Weinstein's Evidence, Paragraph 404 (1975).

which the defendant's honesty was in issue is evidenced by the government's closing argument. Numerous references were made to the doctor's reliance on Lechoco's statements and the defendant's motive to fabricate a defense. Prosecution argued that

> "This defendant wants you to believe that he was mentally ill.
>
> Ladies and gentlemen of the jury, I submit that he is trying to fool you. I submit the evidence clearly places great question on his credibility.
>
> \* \* \* \* \* \*
>
> You are entitled to believe in psychiatrists or not believe in psychiatrists. . . . All these psychiatrists are only as good as what this man tells him. . .

So, ladies and gentlemen of the jury, view the testimony of the psychiatrists in this case with great care because a great part of their opinion is based on what he told them."

In light of the importance of the proffered evidence, going to the heart as it does of the only contested substantive issue in the case, it requires a remand and new trial on the issue of insanity.[6]

*Remanded.*

6. Should this issue present itself on further proceedings, the district court may be guided by Federal Rule of Evidence, Rule 806. The defendant's statements to his psychiatrist fall within the statement to a physician exception to the hearsay rule embodied in Rule 803(4). As such, Mr. Lechoco's credibility was open to attack under Rule 806. The prosecutor's vigorous cross-examination represents the type of attack on credibility contemplated by the term "otherwise" as contained in Rule 608(a). In light of this attack, the defendant is permitted by Rule 806 to present supporting credibility evidence notwithstanding his exercise of his Fifth Amendment rights.